*JOHN M. ROGERS AND GLADYS B. ROGERS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3958-63.   Filed April 30, 1965.

*Michael L. Mellor* and *Edward J. Ruff*, for the petitioners.
*Roger A. Pott*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax of petitioners in the amounts of $111,707.80 for the year 1958 and $1,417.90 for the year 1960.   The parties have reached agreement as to all issues for 1960 and all issues for 1958 except the issue of whether the transfer by petitioners in 1958 of a parcel of realty and the acquisition of another constituted a nontaxable exchange within the meaning of section 1031 of the Internal Revenue Code of 1954 as the petitioners contend, or whether the petitioners' transfer constituted a sale, gain from which is to be recognized under section 1002 of the Code, as determined by the respondent.

### FINDINGS OF FACT

Some of the facts have been stipulated and the stipulations are incorporated herein by this reference.

The petitioners are husband and wife residing at Walnut Creek, Calif.   They filed joint Federal income tax returns on the cash method for the taxable years 1958, 1959, and 1960 with the district director of internal revenue, San Francisco, Calif.   Hereinafter John M. Rogers is referred to as the petitioner.

Late in 1955 the petitioner retired from his position as an executive of a large international engineering construction organization and thereafter was concerned with securing investment income.   In April 1956, petitioners acquired for investment an office building situated at 571 Market Street, San Francisco, Calif. (hereinafter referred to as 571 Market Street), and thereafter held such property for the income derived from rents and profits.   Coldwell, Banker & Co., a San

---

*Court order of Sept. 28, 1965, substituted "Estate of Gladys B. Rogers, Deceased, John M. Rogers, Executor," for "Gladys B. Rogers."

Francisco real estate firm which had been instrumental in the sale of the property to petitioners, performed for a fee the various duties associated with the management of the building.

The Standard Oil Co. of California (hereinafter referred to as Standard Oil) desired to acquire five adjoining properties, including 571 Market Street, as the site for a proposed new office building, and prior to August 22, 1957, commissioned Buckbee Thorne & Co., a San Francisco real estate firm (hereinafter referred to as Buckbee Thorne), to negotiate for the purchase of such five properties on behalf of Standard Oil as undisclosed principal. Since Standard Oil wished to remain an undisclosed principal until all five properties had been assembled, Buckbee Thorne, with the authorization of Standard Oil named California Pacific Title Insurance Co. (hereinafter referred to as the title company) to acquire title for its principal.

During August 1957, petitioners were approached by a representative of Buckbee Thorne who desired to obtain an option to purchase 571 Market Street. They advised such representative that they would sell for a price of $750,000 plus the real estate commission, and on August 13, 1957, an escrow account (numbered 462011) was opened at the title company under the name "Buckbee Thorne—Rogers."

On August 22, 1957, petitioners granted to the title company an option to purchase 571 Market Street. The option agreement provides in pertinent part as follows:

For and in consideration of the sum of SEVEN THOUSAND SEVEN HUNDRED AND TWELVE AND 50/100 ($7,712.50) Dollars to seller in hand paid, the receipt of which is hereby acknowledged by said seller, to apply on the purchase price, the undersigned JOHN M. ROGERS and GLADYS B. ROGERS herein designated as the seller, hereby grants the right and option to purchase and agrees to sell to CALIFORNIA PACIFIC TITLE INSURANCE COMPANY herein designated as the purchaser, or its assigns, at any time within 120 days from the date hereof, the following described property in the City and County of San Francisco, State of California, to wit: * * *

[Here follows description of 571 Market Street]

For the purchase price of SEVEN HUNDRED SEVENTY ONE THOUSAND TWO HUNDRED FIFTY AND 00/100 ($771,250.00) dollars lawful money of the United States of America, payable as follows: CASH

* * * * * * *

If said purchaser elects to purchase said property at the price and on the terms herein set forth, and within the time specified, the said purchaser shall give said seller due notice in writing and shall pay an additional sum of $69,412.50 for account of said seller to Buckbee Thorne & Co. * * * said sum to apply on the purchase price * * *

By letter dated August 30, 1957, Buckbee Thorne transmitted to the title company the option granted by petitioners to the title company as well as options for the other properties Standard Oil was seeking to acquire.

Petitioners then advised Coldwell, Banker & Co., as managers of their property, that they had entered into the option for the sale of 571 Market Street.

In mid-September 1957, petitioners were approached by Coldwell, Banker & Co., acting as agents for the owners of an office building known as the Sharon Building, with the suggestion that the Sharon Building might be purchased for $1,200,000, and that the proceeds from the sale of 571 Market Street might be used for such purpose. Prior to that time, the petitioners were not aware that the Sharon Building was for sale. They advised Coldwell, Banker & Co. at that time that they were not interested in buying another piece of property, but rather that they intended to invest the proceeds from the sale of 571 Market Street in high-grade stock. Coldwell, Banker & Co. then suggested that if they did not wish to purchase the Sharon Building it was possible that an advantageous exchange of 571 Market Street for the Sharon Building could be made and that petitioners would receive a return on their investment which would be substantial and comparable to that which they were then receiving. The petitioners proposed an exchange in which the Sharon Building would be valued at $1,050,000 and 571 Market Street would be valued at its then option price of $771,250. This proposal was rejected, but the owners of the Sharon Building countered with an offer to value the Sharon Building at $1,150,000.

On November 25, 1957, the title company addressed a letter to Standard Oil requesting that the latter assume the obligation of holding the title company harmless on account of any loss it might sustain in making payments to tenants of properties to be acquired in order to secure early terminations of such leases. Standard Oil so agreed.

The petitioners executed a document entitled "Agreement to Exchange" dated December 2, 1957. Such document does not bear any other signatures. Therein it was recited that they agreed to exchange 571 Market Street for the Sharon Building. It was further provided therein that 571 Market Street should be transferred subject to existing leases and "subject to existing option to sell, which obligation is to be assumed by the owners" of the Sharon Building. It was therein further provided that coincident with the exchange of deeds to the two properties the petitioners agreed to pay the owners of the Sharon Building $400,000 in cash. It was further provided that "This offer is made subject to Coldwell, Banker & Co. securing a loan on the Sharon Building in the sum of at least $600,000," with interest, installment payments, and other terms satisfactory to the petitioners.

On December 6, 1957, the petitioners left the above document with Coldwell, Banker & Co. On the same date an escrow account (numbered 463529) was opened at the title company under the name "Sharon—Coldwell Banker & Co."

On December 9, 1957, the petitioner addressed a letter to the title company advising that he had entered into an agreement with the 12 owners of the Sharon Building to exchange 571 Market Street, subject to the outstanding option, for the Sharon Building.

On December 9, 1957, the title company issued a preliminary title report concerning the Sharon Building and delivered it to the petitioners.

On December 16, 1957, Buckbee Thorne notified the title company that thereafter Standard Oil would issue instructions to the title company regarding the options.

On December 16, 1957, the petitioner delivered to the title company his check for $7,712.50, which amount equaled the consideration previously paid to him and his wife for the option granted by them on August 22, 1957. The receipt given by the title company for such amount stated that such sum was to be applied on an exchange proration statement to be supplied by Coldwell, Banker & Co.

On December 17, 1957, petitioners delivered to the title company a deed conveying 571 Market Street to the title company. At the same time the petitioners gave written escrow instructions to the title company "to deliver said deed to the order of Hurford C. Sharon, et al.," at such time as the title company had vested title to the Sharon Building in the petitioners, the petitioners had given the title company their promissory note in the amount of $550,000 payable to Aetna Life Insurance Co. secured by a deed of trust on the Sharon property, and the title company had in its possession the proceeds of a loan of $550,000 from such life insurance company. The title company was further instructed by the petitioners to use the loan of $550,000 to pay off an existing mortgage on 571 Market Street held by Equitable Life Assurance Society, pay Hurford C. Sharon et al., the sum of $368,750, and to make other specified disbursements.

On December 18, 1957, Standard Oil delivered a letter of escrow instructions authorizing and directing the title company to record on December 18, 1957, the five options (including the option on 571 Market Street), to exercise such options on December 19, 1957, by sending notices to the respective property owners in care of Buckbee Thorne, to take title to the properties in its (the title company's) name, and then convey the five parcels of property to Standard Oil in one grant deed. Therein Standard Oil stated that it would at the same time deliver to Buckbee Thorne for the account of the respective owners the amounts which it had been agreed would be paid upon the exercise of the options (including $69,412.50 for the account of the petitioners) and that it would issue to the title company a check for $2,344,537.50 to cover the remaining purchase price of all the five properties.

On December 19, 1957, the title company addressed a letter dated December 13, 1957, to the petitioners in care of Buckbee Thorne, giving notice of the exercise of the option on 571 Market Street. At the same time the title company gave its check in the amount of $69,412.50 to Buckbee Thorne for the account of the petitioners and furnished Buckbee Thorne a copy of the previously mentioned letter of December 9, 1957, addressed by the petitioner to the title company. On the same date, Standard Oil delivered to the title company its check for $2,344,537.50.

On December 20, 1957, Buckbee Thorne notified the petitioners by telephone that the option had been exercised and that it had received from the title company its check for $69,412.50. On the same date, Buckbee Thorne addressed a letter to the petitioners containing the same information and stating that the title company had requested that the check be returned to it to be held by it in connection with an exchange of 571 Market Street for the Sharon Building. Therein Buckbee Thorne requested petitioners' approval to pay over the $69,412.50 to the title company for such purpose. On a copy of such letter, the petitioners on December 23, 1957, acknowledged receipt of notice of the exercise of the option and approved the payment of the $69,412.50 to the title company. Accordingly, on the same day Buckbee Thorne endorsed the check and returned it to the title company.

Between December 19, 1957, and January 8, 1958, each of the 12 owners of the Sharon Building executed a grant deed conveying his interest in the Sharon Building to petitioners. These deeds were delivered to the title company on January 16, 1958, and were enclosed in a letter of escrow instructions by Hurford C. Sharon, acting as agent for the various owners of the Sharon Building, wherein the title company was authorized to deliver the deeds to petitioners when the title company received $1,150,000 for the account of the Sharons. Such letter also contained the following:

It is understood that $400,000.00 of such sum is to be received by you from the Rogers and $750,000.00 is to be received by you from a purchaser of * * * [description of 571 Market Street], which property is hereinafter referred to as the "Exchange Property". It is understood that Rogers will convey to you on behalf of the Owners [Sharon interests], the Exchange Property, in addition to the payment of said sum of $400,000.00. You are hereby authorized to execute a deed of the Exchange Property on behalf of the Owners [Sharons] conveying said property to Standard Oil Company of California the present holder of an option to purchase the Exchange Property, or its order, and you are further authorized to deliver said deed to said grantee when you hold said sum of $750,000.00 heretofore mentioned for the account of the Owners [Sharons].

On the same date the above instructions were amended to authorize the delivery of the deeds to the petitioners upon the receipt by the title

company for the account of the Sharons of $1,118,750 ($368,750 from the petitioners and $750,000 from Standard Oil), instead of $1,150,000, the difference of $31,250 representing commission of Coldwell, Banker & Co. for arranging the transaction. On the same date Hurford C. Sharon issued supplemental instructions to the title company to release the sum of $21,250 out of funds deposited by Standard Oil [1] to satisfy the demand of Buckbee Thorne, and also to prorate rent and insurance credited on the Market Street property and pay it to the ultimate purchaser, Standard Oil.

On January 16, 1958, petitioners deposited with the title company a deed of trust in the amount of $550,000 covering the Sharon Building, as security for the Aetna Life Insurance Co. loan of $550,000 to the petitioners.

On January 16, 1958, the title company recorded the deeds transferring the Sharon Building to the petitioners, and the petitioners' deed conveying 571 Market Street to the title company. On the same date, petitioners notified the tenant of 571 Market Street to pay all future rentals to the title company.

On January 20, 1958, the title company sent to the manager of the office buildings department of Standard Oil a letter in which it was stated that on January 16, 1958, it had recorded, for the account of Standard Oil, the deed from the petitioners to it covering 571 Market Street.

On January 29, 1958, the title company sent a letter to Coldwell, Banker & Co. stating that the Sharon Building was acquired by the petitioners "in consideration of the sum of $400,000.00 and the exchange of Market Street property, which was sold in the same transaction, for a consideration of $750,000.00."

On January 31, 1958, the title company executed one grant deed conveying to Standard Oil the five parcels of property, including 571 Market Street, and such deed was recorded on that date. On the same date the title company assigned the lease of 571 Market Street to Standard Oil and notified the tenant to pay all future rentals to Standard Oil. The delay in transferring the properties to Standard Oil was due to difficulty encountered by the title company in clearing title to some of the property which was to be included, along with 571 Market Street, in a single deed to Standard Oil.

The petitioners had collected the rental on 571 Market Street for the full month of January 1958 in the amount of $4,583.33. Of this amount they retained $2,291.67, representing the amount allocable to the period from January 1 to January 16. The remainder was not received by the Sharon interests but was paid to Standard Oil.

[1] The amount deposited with the title company in escrow was actually $771,250, instead of $750,000.

After the petitioners acquired the Sharon Building they held it for the income derived from rents and profits.

On their Federal income tax return for the taxable year 1958 the petitioners reported the above transaction as follows:

On January 16, 1958, the taxpayers exchanged a building at 571 Market Street, San Francisco, for the Sharon Building, located at 39–61 New Montgomery Street, San Francisco. The exchange was as follows:

Value of property acquired:

| | | |
|---|---:|---:|
| Land (⁵⁄₁₅ per appraisal) | $306, 666. 67 | |
| Building (¹¹⁄₁₅ per appraisal) | 843, 333. 33 | |
| | | $1, 150, 000. 00 |
| Less liabilities assumed | | 550, 000. 00 |
| | | 600, 000. 00 |

Cost of property given up:

| | | | |
|---|---:|---:|---:|
| Building | $194, 000. 00 | | |
| Less depreciation | 13, 580. 00 | | |
| | 180, 420. 00 | | |
| Land | 129, 463. 50 | | |
| | | 309, 883. 50 | |
| Less liabilities transferred | | 148, 500. 00 | 161, 383. 50 |
| | | | 438, 616. 50 |
| Expenses of exchange (net) | | | 20, 011. 43 |
| Unrecognized gain | | | 418, 605. 07 |

In accordance with Section 1031 of the Internal Revenue Code, the gain is not recognized.

In the notice of deficiency the respondent determined that gain should be recognized, stating:

It is determined that you realized a long-term capital gain in the amount of $439,265.85 resulting from the sale of the real estate known as 571 Market Street, San Francisco, California. Such gain is taken into account to the extent of 50%, or $219,632.92, in computing taxable income. The gain is computed as follows:

| | |
|---|---:|
| Sales price | $771, 250. 00 |
| Expense of sale | 22, 100. 65 |
| Net | 749, 149. 35 |
| Basis per return | 309, 883. 50 |
| Gain on sale | 439, 265. 85 |

OPINION

The respondent determined, and contends, that the transactions by which the petitioners disposed of 571 Market Street and acquired the Sharon Building do not qualify as an exchange under the nonrecogni-

tion provisions of section 1031 of the Internal Revenue Code of 1954,[2] but that, rather, the petitioners sold 571 Market Street pursuant to the option which they had entered into with the title company, acting on behalf of Standard Oil, and purchased the Sharon Building. It is his position that capital gain must be recognized upon the disposition of 571 Market Street under the provisions of section 1002 of the Code.[3]

The petitioners, on the other hand, contend that after the option was granted, and was still an executory contract, they entered into an agreement to exchange 571 Market Street for the Sharon Building; that thereafter they did effect such an exchange; and that therefore none of the gain realized by them on the disposition of 571 Market Street is to be recognized, in view of the provisions of section 1031 of the Code.

The purpose of section 1031(a) is to defer recognition of gain or loss when a direct exchange of property between a taxpayer and another party takes place. The sale of property and the purchase of similar property does not constitute an exchange. See *Trenton Cotton Oil Co.* v. *Commissioner*, (C.A. 6) 147 F. 2d 33, reversing on other grounds a Memorandum Opinion of this Court; and *Coastal Terminals, Inc.* v. *United States*, (C.A. 4) 320 F. 2d 333.

In support of their claim that there was an agreement between them and the Sharons to exchange 571 Market Street for the Sharon Building the petitioners introduced in evidence a document entitled "Agreement to Exchange." Therein it was recited that the petitioners agreed to such an exchange. However, such document was signed only by the petitioners, and therein their undertaking is referred to as an "offer." Such "offer" was made subject to the petitioners' obtaining a loan on the Sharon Building. The petitioner testified that it was his understanding that Coldwell, Banker & Co. discussed with the Sharon interests the matter of an exchange and that Coldwell, Banker & Co. informed him that the Sharons would enter into an exchange on the basis of $1,150,000 for their property. He further testified that he considered himself bound to carry out the exchange

---

[2] SEC. 1031. EXCHANGE OF PROPERTY HELD FOR PRODUCTIVE USE OF INVESTMENT.

(a) NONRECOGNITION OF GAIN OR LOSS FROM EXCHANGES SOLELY IN KIND.—No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

(b) GAIN FROM EXCHANGES NOT SOLELY IN KIND.—If an exchange would be within the provisions of subsection (a) * * * if it were not for the fact that the property received in exchange consists not only of property permitted by such provisions to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, in an amount not in excess of the sum of such money and the fair market value of such other property.

[3] SEC. 1002. RECOGNITION OF GAIN OR LOSS.

Except as otherwise provided in this subtitle, on the sale or exchange of property the entire amount of the gain or loss, determined under section 1001, shall be recognized.

with the Sharons and that he was at all times prepared to exchange with the Sharons, irrespective of whether the option was exercised, if the Sharons were willing to accept 571 Market Street subject to the terms of the Standard Oil option.[4]  Apparently there was no exchange agreement signed by both the petitioners and the Sharon representatives.  Whatever agreement there was between them was apparently reached through Coldwell, Banker & Co.  There is no testimony by any representative of Coldwell, Banker & Co. or the Sharon interests.[5]  Accordingly, we must resort to the escrow instructions issued to the title company by the petitioners and by the Sharon interests in order to determine the substance of the agreement.

In their instructions, issued December 17, 1957, the petitioners directed the title company to deliver to the order of the Sharon interests the deed covering 571 Market Street when the title company had vested in the petitioners title to the Sharon Building and had a loan of $550,000 from an insurance company and notes of the petitioners therefor secured by a mortgage on the Sharon Building.

On December 19, 1957, Standard Oil exercised, through the title company, its option to purchase 571 Market Street and paid to the title company for the account of the petitioners an additional amount of $69,412.50, in accordance with the terms of the option agreement.  On the same date Standard Oil gave to the title company its check to cover the remaining purchase price of 571 Market Street, and instructed the title company to take title to the property in its own name and to then convey the property, together with the other properties, to Standard Oil in one deed.

It was not until January 16, 1958, that the owners of the Sharon Building delivered to the title company, as escrow agent, deeds in favor of the petitioners covering the Sharon Building, and issued instructions to such escrow agent.  Such instructions specifically provided that the deeds were to be delivered by the escrow agent to the petitioners when such escrow agent had received for the Sharons the amount of $1,118,750, to consist of a payment of $368,750 from the petitioners and $750,000 from Standard Oil, whereupon the escrow agent was to execute a deed conveying 571 Market Street to Standard Oil.  It appears, therefore, that from the standpoint of the Sharon interests, there was no intention of committing themselves to accept-

---

[4] His testimony in this respect was as follows :

"Q. Mr. Rogers, did you consider yourself bound by this agreement to exchange, Exhibit 39, irrespective of whether or not Standard Oil exercised its option on the Market Street property ?"

"A. Yes, sir.  I was obliged to exchange with the Sharons."

"Q. And were you at all times prepared to exchange with the Sharons irrespective of whether the option was exercised ?"

"A. I was if they had accepted it on the terms of the Standard Oil option."

[5] And it may be stated that we are not informed as to how the Sharon interests treated the transaction for tax purposes.

ing title to 571 Market Street until such time as Standard Oil had exercised its option and had paid the purchase price to the title company. Indeed, at the time the Sharon interests delivered deeds to the Sharon property and issued instructions to the escrow agent Standard Oil had already exercised the option and had paid the purchase price of the property to the title company. It seems clear to us that by that time a valid and binding contract of purchase and sale of 571 Market Street had been consummated between petitioners and Standard Oil, and that Standard Oil was entitled to receive a deed to that property.[6] This being true, it also seems clear to us that the Sharon interests never obtained any ownership in 571 Market Street. The petitioners contend that an optionor may transfer property subject to the option. Be that as it may, we think it clear that the petitioners did not transfer 571 Market Street to the Sharons. Their transfer of title to 571 Market Street to the title company in the name of the latter did not effect a transfer to the Sharons. And it was not until January 16, 1958, that the Sharons delivered deeds covering the Sharon Building to the title company. Clearly, up to that time there was no exchange between the petitioners and the Sharons. And by that time it was impossible for the Sharons to obtain any ownership of 571 Market Street since the petitioners had already effectively disposed of that property to Standard Oil.[7] The Sharon interests therefore were not in receipt of any property from the petitioners and hence there was no exchange between them and the petitioners. While the petitioners, at the time they delivered a deed transferring title to 571 Market Street to the title company, issued instructions

---

[6] The general law with respect to the exercise of options is set forth in 91 C.J.S., Vendor & Purchaser, sec. 13, as follows:

"By exercising the option within the stipulated time, the optionee becomes the owner of an equitable interest,[74] which interest becomes vested;[75] or the optionee becomes the equitable owner of the land subject to performance of his contract obligations with the optioner,[76] and the legal title is held by the optioner as trustee for the optionee;[77] * * *." (Footnotes omitted.)

The law of California is in accord. Thus in *Caras* v. *Parker*, 149 Cal. App. 2d 621, 309 P. 2d 104, it was stated in part:

"* * * As stated in *Menzel* v. *Primm*, 6 Cal. App. 204, 209, 91 P. 754, 756: 'The distinction between a contract to purchase or sell real estate and an option to purchase is that the contract to purchase or sell creates a mutual obligation on the one party to sell and on the other to purchase, while an option merely gives the right to purchase within a limited time without imposing any obligation to purchase. 29 Am. & Eng. Ency. of Law, 2d Ed., p. 606. In other words, an option is a contract by which the owner of property invests another with the exclusive right to purchase said property at a stipulated sum within a limited or reasonable time in the future. Or, stated in another form, it is a right "acquired by contract to accept or reject a present offer, within a limited or reasonable time in the future." 21 Am. & Eng. Ency. of Law, p. 924. When the offer thus made is, within the time stipulated, accepted by any sufficient act or words of the party acquiring the right to accept or reject such offer, the transaction between the parties, *ipso facto*, ceases to be an option, but becomes a sale or contract of sale, according to the circumstances of the acceptance.'" See also *Ludy* v. *Zumwalt*, 85 Cal. App. 119, 259 Pac. 52.

[7] It should be pointed out that we are not here called upon to decide precisely when the sale took place. Neither party contends that the sale occurred in 1957 rather than in 1958.

to the title company "to deliver said deed to the order of Hurford C. Sharon, et al.," and while Hurford C. Sharon issued instructions on January 16, 1958, to the title company in which he "authorized" the title company to execute a deed conveying the property to Standard Oil, these were mere formal matters which do not reflect the substance of the transaction, as pointed out hereinabove.

It is, accordingly, our conclusion that the petitioners sold 571 Market Street to Standard Oil pursuant to the option, that the proceeds therefrom were used by them to purchase the Sharon Building, and that there was not an exchange by the petitioners of 571 Market Street for the Sharon Building.

We have not overlooked the testimony of the petitioner to the effect that he was not interested in purchasing the Sharon Building, but only in exchanging 571 Market Street therefor. However, it is well settled that a taxpayer's expectations and hopes as to the tax treatment of his conduct in themselves are not determinative (*Commissioner* v. *Duberstein*, 363 U.S. 278) and that matters of taxation must be determined in the light of what was actually done rather than the declared purposes of the participants. (*Weiss* v. *Stearn*, 265 U.S. 242.)

We have carefully considered the cases of *Alderson* v. *Commissioner*, (C.A. 9) 317 F. 2d 790; *Coastal Terminals, Inc.* v. *United States*, *supra*; and *Mercantile Trust Co. of Baltimore*, 32 B.T.A. 82, cited by the petitioners. Each of those cases is distinguishable from the instant case. In each of the cited cases the taxpayer had agreed to transfer property to another party for property which the other party did not then own. However, in each the other party obtained property and carried out the terms of the agreement. In each of those cases both the form and the substance of the transaction was an exchange. In the instant case there was no exchange between the petitioners and the Sharon interests because the Sharons did not acquire ownership of 571 Market Street. There was no exchange between the petitioners and Standard Oil because the latter did not transfer any property to the petitioners. The petitioners, of course, recognize this but on brief contend that in principle the cited cases are governing. They state that they might have placed themselves in the precise position of the taxpayers in those cases by inducing Standard Oil to purchase the Sharon Building so that an exchange could have been effected with Standard Oil, in which event the result would have been the same in that petitioners would hold the Sharon Building, Standard Oil would hold 571 Market Street, and the Sharons would have realized cash. They state that the difference in how the end result is accomplished is immaterial. We cannot agree. Our decision must be governed by what was actually done, rather than by what might have been done. *Television Industries, Inc.* v. *Commissioner*, (C.A. 2) 284 F. 2d 322, and cases cited therein, affirming 32 T.C. 1297.

We hold that the respondent did not err in his determination that gain upon the disposition by the petitioners of 571 Market Street is to be recognized.   In view of our conclusions hereinabove, it is unnecessary to consider the additional argument advanced by the respondent that after the granting of the option the petitioners held 571 Market Street primarily for sale and that for that reason section 1031 is not applicable.

*Decision will be entered under Rule 50.*