June Pinson **CARLTON** and Charles T. **Carlton, as Administrators of the Estate of Thad H. Carlton, and June Carlton, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 65–422–Civ–DD.

United States District Court
S. D. Florida.

April 26, 1966.

---

Robert O. Rogers, West Palm Beach, Fla., for plaintiffs.

William A. Meadows, Jr., U. S. Atty., and Alfred E. Sapp, Asst. U. S. Atty., Miami, Fla., Myron C. Baum and Charles L. Ruffner, Department of Justice Attys., for defendant.

## OPINION

DYER, District Judge.

This is a tax refund case. Plaintiffs seek to qualify certain transactions made in 1959 as a § 1031 tax-free exchange. The facts are fully stipulated.

Thad H. Carlton, hereinafter referred to individually as decedent, and June Carlton, hereinafter jointly referred to as plaintiffs, were, during the calendar years 1959 and 1960, husband and wife with their principal place of residence at 1707 South Indian River Drive, Fort Pierce, Florida. They filed a timely joint federal income tax return for each of said calendar years with the District Director of Internal Revenue, Jacksonville, Florida.

Plaintiffs were engaged in the ranching business for a substantial part of their married life. Prior to or during the year 1951, they acquired a tract of land in St. Lucie County, Florida, hereinafter referred to as the ranch property, which tract had a cost basis in their hands in the amount of $8,918.81. From this time until the time of its disposition, as hereinafter described, plaintiffs held the ranch property for use in that business.

On October 18, 1958, plaintiffs entered into a contract with General Development Corporation, hereinafter referred to as General, whereby they granted General an option to acquire the ranch property. At the time of execution, plaintiffs received the consideration described in paragraph one of said contract.

Simultaneously with the forwarding of the executed copies of the aforementioned contract to General on September 27, 1958, plaintiffs entered into an agreement with two real estate brokers who were instrumental in negotiating the options. The agreement obligated plaintiffs to pay stipulated commissions to said brokers in the event that the options were exercised and "the transactions of sale and purchase * * * closed."

Plaintiffs planned to continue their ranching business, and at all times during the negotiations with General, desired to exchange the ranch property for other real property that could be used by them in that business. It was their intention to sell the ranch property solely for cash if they were unable to locate a suitable piece of property which they were able to take in exchange. Their motivation in handling the transaction in this fashion was to avoid capital gains taxes if they could. Accordingly, as a condition to executing the heretofore described option, they required General to agree to the conditions set out in paragraph 10 thereof. General merely desired to acquire the ranch property for cash.

During the latter part of 1958 and early 1959, decedent conducted negotiations with representatives of the Estate of Raymond D. Lyons, hereinafter referred to as the Lyons Estate, relative to the acquisition of certain real property located in Glades County, Florida, hereinafter referred to as the Lyons property. On October 31, 1958, decedent

submitted a written offer to purchase this property from the Estate. The letter confirmed an oral understanding with said representatives that the contract of purchase would be with General, that General would convey, or cause the property to be conveyed to decedent, and that decedent would reserve the right to cause the contract to be assigned to him by General and to close the purchase directly with the Estate if he elected to do so. The letter requested the Estate to advise decedent as to whether or not the offer was acceptable, and indicated that if it was, he would work out the details of the purchase agreement with them. The representatives of the Estate then advised its beneficiaries of the offer made by decedent, at the same time recommending that the contract be drawn so as to require decedent's personal endorsement on General's notes in order that recourse could be had directly against him in the event of any collection problems on the mortgage. After receiving concurrences from the beneficiaries, the Estate's representatives proposed certain amendments to the offer, including the aforementioned, and requested that decedent review the changes and advise them if they were acceptable.

On January 4, 1959, decedent physically inspected the Lyons property, and then advised the representatives of the Lyons Estate that he was working out a final schedule with General in order to determine the amount of time "I will need to close the purchase."

On January 15, 1959, decedent met with the representatives of the Lyons Estate, discussed his future plans for the Lyons property, and proposed that the closing date be extended to August 1, 1959. The Estate's representatives then advised decedent that their attorney had been requested to contact him in regard to preparation and execution of a contract for the sale of the property.

On January 28, 1959, decedent wrote the representatives of the Lyons Estate advising them that he had completed the proposed sales agreement covering the Lyons property and had forwarded it to General's attorneys, but requesting them to call him directly in the event that some changes were necessary in it. At the same time, decedent caused his bank to issue a cashier's check in the amount of $32,500.00, which he forwarded directly to the Estate's representatives to be used as the first payment on the property only upon the execution of an acceptable agreement by General. The payment was made direct in order to save the time that would be otherwise required to transmit the funds to Miami and then to Palm Beach. Decedent also advised the Estate that the date of closing was important to him, and that he desired a simultaneous closing on the sale of his property to General and the purchase of the Lyons property "because of the tax feature involved." Decedent reiterated an earlier statement that "it was his intention to close the purchase of the Lyons property, * * * irrespective of whether or not General Development Corporation elects to exercise its option to purchase my property. I cannot well afford to forfeit the $32,500.00 payment, if it can possibly be avoided." According to the terms of the Lyons contract, decedent would have forfeited the $32,500.00 down payment if the Fernandez deal had not been consummated.

On January 28, 1959, after completion of these negotiations with representatives of the Lyons Estate, and in accordance with the privilege granted by plaintiffs' contract with General, decedent notified General, through its attorney, Mr. Morris Salomon, that he was requiring them to purchase the Lyons property for conveyance to him in accordance with their contract.

On or about January 28, 1959, pursuant to decedent's instructions, General entered into a contract with the Lyons Estate for the purchase of the Lyons property. A letter from the Estate's representatives dated February 10, 1959, indicates that the original contract was executed by both General and plaintiffs, but was altered thereafter by the Estate and duplicate originals of the final con-

tract were forwarded to decedent, who obtained General's signature on them.

On May 11, 1959, General notified plaintiffs that it was exercising its option to acquire the ranch property.

On May 14, 1959, after receipt of the aforementioned election by General, decedent requested the Estate to update the abstracts on its property and have them sent to him. On the same date, he requested permission from the Estate to clean up the premises of the Lyons property and to begin construction of two houses and a barn on them on or about June 1, 1959, in order to have the construction completed at the time of closing, when he desired to move his ranching operation there. Decedent promised to prohibit any liens from attaching to the premises, and stated that the sale of his property to General "will be closed at the same time I close my purchase with you." On May 20, 1959, the Estate advised decedent that, in view of his excellent personal reputation, it would permit him to begin construction according to his wishes.

During the year 1959, decedent had similar negotiations with J. M. Fernandez and Sylvia Fernandez, his wife, relative to the acquisition of certain real property situated in Hendry County, Florida, hereinafter referred to as the Fernandez property. After he completed these negotiations, decedent notified General that he was requiring it to purchase the Fernandez property in accordance with their contract. On June 1, 1959, General executed a contract for the purchase of the Fernandez property. On June 2, 1959, the following endorsement was added to this contract over the signature of decedent, as required by Mr. and Mrs. Fernandez:

I accept and agree to the provisions of the foregoing, and I further agree with the sellers, that when the property is conveyed to me, I will assume the mortgage and be personally responsible for its payment. I further agree that sellers shall have 90 days from date of closing to remove their cattle from the property.

Plaintiffs intended to have all three transactions closed on August 3, 1959, in a manner that would qualify as a tax free exchange. Upon the basis of advice from his accountant that it would so qualify, a procedure was adopted whereby General paid the plaintiffs the full amount of cash due at closing and assigned its rights under the Lyons and Fernandez contracts to plaintiffs, who in turn intended to acquire title directly from Lyons and Fernandez. To accomplish this, General prepared assignments to plaintiffs of its contractual rights under the Lyons and Fernandez agreements.

The closing of the transaction involving the sale from plaintiffs to General was held in Miami as scheduled on August 3, 1959. The amount shown on the closing statement as "cash to close" was paid by General by means of a cashier's check in the amount of $199,797.78 payable to plaintiffs. On the same date, General issued its ten-year, interest-bearing, installment promissory note, in the amount of $952,143.00 to plaintiffs.

At the time of the heretofore described closing, General executed the assignments of its contractual rights to the Lyons and Fernandez properties to plaintiffs.

Immediately following the heretofore described transaction, and on the same date, decedent proceeded to Palm Beach, and delivered his own check in the amount shown on the closing statement as cash necessary to close ($48,750.00) and the assignment to the representatives of the Lyons Estate. Those representatives then deeded the Lyons property to plaintiffs and completed the closing. At the time he issued said check, the balance in decedent's bank account upon which said check was drawn was $17,314.36.

On the following date, August 4, 1959, decedent delivered his own check in the amount shown as cash necessary to close ($14,418.18) and the assignment by General to J. M. and Sylvia Fernandez, completed the closing of the Fernandez transaction and received a deed to that property. On the same date, the check issued

to plaintiffs on General's behalf on August 3, 1959, was deposited in the bank account against which the checks to the representatives of the Lyons Estate and Fernandez were drawn. As a condition to such closing, and as a part of the cash required to close said transaction, decedent did at the time of closing, deliver his checks in payment of the obligations of J. M. and Sylvia Fernandez to the Bradenton National Farm Loan Association in the amount of $9,182.17, and to Harry S. Eubanks in the amount of $9,700.00.

From the time of acquisition, the Lyons and Fernandez properties were used by the plaintiffs in their trade or business of ranching.

On August 4, 1959, the brokers referred to earlier in these stipulations entered into an agreement with their legal advisor to pay him certain sums of money for his services "in connection with the sale of certain properties in St. Lucie County, Florida, to the General Development Corporation."

In their joint federal income tax return for the taxable year ended December 31, 1959, plaintiffs treated the heretofore described transaction with General as an exchange of the ranch property for the Lyons and Fernandez properties and reported the consideration received in excess of the property exchanged as long term capital gain utilizing the installment method of reporting their recognized gains, under Section 453 of the Internal Revenue Code of 1954. In reporting the installment sale on their returns, plaintiffs reduced the total amount of the initial payment by $120,400.00, an amount which represented the cash portion of the proceeds paid on the two acreage purchases, and allocated only the remaining portion of the $253,102.00 that they received from General to the recognized portion of the installment gains.

During the year 1960, plaintiffs expended the amount of $4,760.70 as a commission in connection with the collection of interest income, no part of which commission was deducted by them in their joint federal income tax return for the taxable year ended December 31, 1960.

The joint federal income tax return filed by plaintiffs for the taxable year ended December 31, 1959, was audited by the Internal Revenue Service, and as the result of such audit, the Internal Revenue Service did determine that there was a deficiency in income tax due from plaintiffs for said taxable year in the amount of $34,337.63. Said deficiency was predicated on the determination that the transaction involving the ranch, Lyons and Fernandez properties was not an "exchange" within the meaning of Section 1031 of the Internal Revenue Code of 1954.

The deficiency as determined by the Internal Revenue Service was assessed, and on April 17, 1964, plaintiffs satisfied said assessment, together with interest thereon. On or about September 2, 1964, plaintiffs filed with the District Director of Internal Revenue, Jacksonville, Florida, a claim, Form 843, requesting a refund of said amount of $34,337.63, plus interest thereon as provided by law.

On or about March 17, 1964, plaintiffs filed a claim, Form 843, for refund of taxes paid by them for the taxable year ended December 31, 1960, in the amount of $2,808.81, which claim was predicated upon the contention that they were entitled to deduct the amount of $4,760.70 in computing their taxable income for said taxable year as commissions paid in connection with the collection of income, no part of which amount was deducted by them in their return for said taxable year.

Under date of December 15, 1964, the District Director of Internal Revenue, Jacksonville, Florida, notified plaintiffs of the disallowance of the claims.

■ Plaintiffs entered the transactions with ranch property and came out with ranch property. Were it not for tax considerations, the natural course of events would have been a sale and purchase situation. However, tax considerations of Section 1031 dictate the use of

a property exchange whenever possible. The usual situation is a two party transaction, but a three cornered transaction may be used to gain the Section 1031 tax advantage. Alderson v. Commissioner, (9 Cir. 1963), 317 F.2d 790, 794.

Both the plaintiffs and the respondent invoke the doctrine that substance not the form of the transaction controls. Commissioner of Internal Revenue v. Court Holding Company, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945). That both parties were able to invoke the doctrine is indicative of the difficulty of clearly distinguishing form from substance.

Plaintiffs have attempted to recast the form and substance of this sale and purchase situation into an exchange situation. This is clear from the record. A taxpayer may arrange his deal so as to come within the scope of Section 1031, Alderson v. Commissioner, supra; however, intentions alone are not enough. It is what was done, not what might have been done that controls. Rogers v. Commissioner, 44 T.C. 126, 136.

Plaintiffs did not fully perfect the form of the transaction as an exchange in that legal title never vested in General. At best, General transferred an equitable interest. The "substance" of the transaction is less an exchange than the "form." The fact that legal title never vested in General is also indicative that the "substance" was a sale and a purchase rather than an exchange. Several additional factors indicate that in substance this was a sale and a purchase and not an exchange. Petitioner was the active party in arranging the Lyons and Fernandez deals. Petitioner was personally liable on the mortgages securing the Lyons and Fernandez deals. The transactions did not depend upon the reordering as an exchange, but were enforceable as a sale to General and as purchases from Lyons and Fernandez.

Having considered the record, the briefs, and the arguments of the parties, I find that the plaintiffs failed to bring the transactions within the scope of Section 1031.

Judgment dismissing plaintiffs' complaint with prejudice and costs to be submitted within ten (10) days.