**Harry C. and Miriam CAPLAN,**
**Plaintiffs,**

v.

**UNITED STATES of America,**
**Defendant.**

Civ. No. 65–834.

United States District Court
S. D. Florida.

Dec. 9, 1966.

Sidney A. Soltz, Miami, Fla., for plaintiffs.

Mitchell Rogovin, Asst. Atty. Gen., Myron C. Baum and Charles L. Ruffner, Attys., Dept. of Justice, Washington, D. C., Alfred E. Sapp, Asst. U. S. Atty., Miami, Fla., for defendant.

## MEMORANDUM OPINION

MEHRTENS, District Judge.

This is a civil action for the refund of federal income taxes and interest thereon in the amount of $1,564.84 paid to the defendant by the plaintiff for the years 1961 and 1962.

The only issue to be decided is whether plaintiff, Harry C. Caplan, is entitled to deduct his partnership share of a loss on the sale of a building to a corporation owned by his brother, by offsetting the loss against installment gains realized on the redemption of stock by the same corporation, where the redemption took place two years prior to the sale of the building.

The facts have been fully stipulated and are hereby adopted as Findings of Fact, as follows:

Marvin Envelope Co., Inc., an Illinois corporation, with offices in Chicago (hereinafter alternatively referred to as Marvin or the corporation) was incorporated in 1929. As of June 27, 1959, plaintiff-taxpayer, Harry C. Caplan (hereinafter referred to as plaintiff), owned 45% of the stock of Marvin. His brother, Samuel S. Caplan (hereinafter referred to as Samuel), owned the other 55% of the stock.

As of June 27, 1959, plaintiff and Samuel were equal partners of the Wicker Park Building Partnership (hereinafter referred to as the partnership), which owned an office building in Chicago, Illinois. The corporation (Marvin) occupied approximately 30% of the building owned by the partnership.

Plaintiff served as vice president and as a director of Marvin until January of 1957 when he was forced out of office due to a disagreement with his brother Samuel. Plaintiff then moved from Chicago to Miami, Florida, and has resided there since.

On June 27, 1959, an agreement between Marvin and plaintiff was executed for the purchase of plaintiff's corporate stock by Marvin. Plaintiff's gain on this sale was $47,353.70 and he elected to report the gain on the installment basis.

From the year of sale through the years in issue the gain was reported as follows: 1959, $14,733.66; 1960, $2,340.68; 1961, $3,870.88; 1962, $3,870.88.

Also, on June 27, 1959, an agreement between Samuel and plaintiff was executed for the sale of the Wicker Park Building. That agreement provided that, upon an offer having been made by anyone, either partner could purchase the building by matching that bid, in lieu of accepting the offer.

Plaintiff would not have entered into the arrangement in issue unless it involved both agreements being executed contemporaneously.

On or about October 7, 1961, plaintiff's son-in-law, Edwin E. Rabin, offered to purchase the Wicker Park Building for $105,000. If the offer had been accepted by Samuel, plaintiff would have advanced the $105,000 purchase price and would have been the beneficial owner of the building; however, Samuel elected to purchase the building for this price and the building was sold on November 30, 1961, by agreement of the brothers, to Marvin, 100% of the stock of which was owned by Samuel.

The partnership suffered a loss of $32,136.95 on the sale of the Wicker Park Building in 1961. The plaintiff claimed his share of the building loss ($16,068.48) on his 1961 income tax return and carried over an unused balance of the loss to the year 1962. The Commissioner of Internal Revenue, acting through his duly authorized representative, the District Director of Internal Revenue for the District of Florida, disallowed the claimed loss and accordingly increased taxpayer's adjusted gross income for 1961 and 1962 in the amounts of $4,197.82 and $2,832.24, respectively. Deficiencies in taxes were asserted and paid and claims for refund were filed. The claims were disallowed and this suit was timely filed.

Section 267 of the Internal Revenue Code of 1954 provides that no deduction shall be allowed for losses from the sale or exchange of property between persons specified within any one paragraph of subsection (b). The pertinent provisions of subsection (b) of Section 267 provide that the persons referred to in subsection (a) are:

(1) Members of a family, as defined in subsection (c) (4);

(2) An individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual;

\*   \*   \*   \*   \*   \*

For purposes of determining the constructive ownership of stock under Section 267, subsection (c) of that section provides:

(1) Stock owned, directly or indirectly, by or for a corporation, partnership, estate, or trust shall be considered as being owned proportionately by or for its shareholders, partners, or beneficiaries;

(2) An individual shall be considered as owning the stock owned, directly or indirectly, by or for his family;

(3) An individual owning (otherwise than by the application of paragraph (2)) any stock in a corporation shall be considered as owning the stock owned, directly or indirectly, by or for his partner;

(4) The family of an individual shall include only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants;

\*   \*   \*   \*   \*   \*

From the above, the plaintiffs must be considered to own the stock of Marvin by application of the constructive ownership provisions of Section 267(c).

Section 261 of the Internal Revenue Code of 1954, which relates to Section 267, provides:

In computing taxable income no deduction shall in any case be allowed in respect of the items specified in this part.

The legislative history of Sections 261 and 267 does not indicate that Congress intended to limit the application of Sec-

tion 267 in any way, except as expressly stated therein. The courts have upheld the provisions of Section 267 and its predecessor, Section 24(b) of the Internal Revenue Code of 1939 which disallow losses between related individuals such as herein involved.

The Supreme Court concluded in McWilliams v. Commissioner, 331 U.S. 694, 699, 700–701, 67 S.Ct. 1477, 1480, 91 L. Ed. 1750 (1947):

> Section 24(b) states an *absolute prohibition*—not a presumption—against the allowance of losses on any sales between the members of certain designated groups. * * *
>
> * * * * * *
>
> We conclude that the purpose of § 24(b) was to put an end to the right of taxpayers to choose, by intra-family transfers and other designated devices, their own time for realizing tax losses on investments which, for most practical purposes, are continued uninterrupted.
>
> We are clear as to this purpose, too, that its effectuation obviously had to be made independent of the manner in which an intra-group transfer was accomplished. Congress, with such purpose in mind, could not have intended to include within the scope of § 24(b) only simple transfers made directly or through a dummy, or to exclude transfers of securities effected through the medium of the Stock Exchange, unless it wanted to leave a loophole almost as large as the one it had set out to close. (Emphasis supplied.)

The court in Nieman v. Commissioner, 33 T.C. 411 (1959), expanded the *McWilliams* doctrine and held that stock owned by a taxpayer's brothers, sisters, wife and parents was attributable to him in applying the 50% stock ownership test to a sale to a controlled corporation. It reasoned that the fact that the sale was actually at arm's length was of no moment.

Congress could have excluded bona fide sales under the provisions of Section 267, but it has not elected to do so. The Tax Court in Blum v. Commissioner, 5 T.C. 702 (1945), considered a taxpayer's contention that Section 24(b) of the 1939 Internal Revenue Code did not apply to a bona fide sale of a partnership interest, in the context of a sale between brothers who had a falling out and decided to terminate their business interests through a sale by one brother of his partnership interest to another. The court traced the provision's history and noted, at pages 711 and 712, that:

> * * * its enactment was brought about because of many family transactions which were sham and for the sole purpose of suffering losses for tax purposes, and he suggests that if the statute is applicable to a bona fide sale of a partnership interest, it works such a hardship as to challenge its soundness.
>
> Undoubtedly Congress, in enacting the provision in question, was motivated by a desire to prevent intrafamily transactions in property for the sole purpose of sustaining "unreal" losses to be deducted for tax purposes. Almost every reference to the measure in the Committee reports and in debate on the floor of the House and the Senate commented on the fact that many "shocking" instances of such transactions had come to light, and that they constituted a major source of tax avoidance. Committee members in charge of the measure stated their belief that it would "effectively close this loophole."
>
> Nevertheless, the language chosen by Congress to accomplish its purposes was that "no deduction shall *in any case* be allowed in respect of losses from sales or exchanges of property, directly or indirectly, * * * between members of a family." (Italics Court's.) That language is so broad as to admit of no exception. It is true that a hardship may result in particular cases, as in this one, where the transaction is in entire good faith; and there is some indication in the history of the measure that the legislators were not unaware of that fact. How-

ever, it was the belief of the drafters that, on the whole, the measure would be fair to the great majority of taxpayers. Congress could have provided that no deduction should be allowed in respect of losses from intrafamily transactions unless they were bona fide. That it did not do. It may be that such a qualification would have defeated the purpose of the measure, or it may be that consideration of administrative convenience in collecting the revenues outweighed the occasional hardships which would result in particular cases. But whatever the reasons, the purpose being a legitimate one, the wisdom of the choice of the means is a matter for the decision of Congress, not of the courts. We could not, without indulging in judicial legislation, graft an exception upon the broad measure adopted by Congress.*

The Fifth Circuit reached a similar conclusion in Lakeside Irr. Co. v. Commissioner, 128 F.2d 418 (1942), cert. denied, 317 U.S. 666, 63 S.Ct. 71, 87 L.Ed. 535. In that case, a controlled corporation attempted to lump together the value of four separate blocks of stock in unrelated corporations that it transferred, in one transaction, to a controlling stockholder in payment of outstanding debts owing to the stockholder. The blocks of stock had been acquired in separate purchases and could have been separately sold. The stockholder controlled the corporation through ownership of stock in conjunction with her children and grandchildren. The transfer of two of the blocks of stock resulted in a gain aggregating $11,525, while the transfer of the other two blocks resulted in a loss of $11,175.50. Since only one single transfer was involved in return for the cancellation of the indebtedness, the corporation reported only the net gain of $349.50 on its tax return. The Commis-

sioner disallowed this, and required the corporation to report the gains in full, while disallowing the losses. The Fifth Circuit upheld the Commissioner, and stated (128 F.2d p. 419):

* * * where, as here, four unrelated lots of stock were separately acquired and might readily have been separately sold, the fact that after ascertaining the value of each lot all were transferred together for a lump price will not require or authorize a merger of costs. The United States may enquire as to which stocks were disposed of at a profit and tax the profit, and may ignore losses altogether on the disposal of other stocks, *though realized at the same time and in the same transaction.* Section 24(a) is emphatic in declaring that in the transactions it names, including loss from sales or exchanges between persons related as they are here, "no deduction shall in any case be allowed." It seems hard that this is so in this case, because it would have been otherwise had the stocks been sold and the money paid to the creditor stockholder, who might with the money have bought these or like stocks; but thus the statute is written. (Emphasis supplied.)

The Court of Appeals for the Second and Third Circuits have adhered to the foregoing line of decisions. Morris Investment Corp. v. Commissioner, 156 F.2d 748 (C.A.3d 1946); M. F. Reddington Co. v. Commissioner of Internal Revenue, 131 F.2d 1014 (C.A.2d 1942). In *Reddington,* the court pointed out that Congress was not required to permit any deductions from gross income in determining income tax and if, in forbidding deductions of losses from sales between related parties, it had intended to refer to "net losses" from simultaneous transactions, it would have been "easy to say so."

---

* The Tax Court also referred to legislature history in Engelhart v. Commissioner, 30 T.C. 1013 (1958), in which it stated:

   * * * neither in the legislative history nor elsewhere is there any indication that Congress intended to limit the application of these provisions in any way except as expressly stated therein.

The court specifically stated (pp. 1015–1016):

> The application of the "so easy to say so rule" is pertinent here, since Congress elsewhere in the same Act used the "net loss" locution: In Section 117 of the same Act, it provided in subdivision (d) (2), 26 U.S.C.A.Int.Rev. Acts, page 1062 that "short-term capital losses shall be allowed only to the extent of short-term capital gains," and went on in subdivision (e) to provide for a carry-over in the event of a "net short-term capital loss."

It is especially significant to note that in both the *Lakeside* and the *Reddington* cases, the courts were dealing with a lump block sale by a corporation of shares of stock in different corporations to their controlling shareholders, and the selling corporations were required to recognize gain on some of the sales while being denied losses on others, despite the fact that all of the sales were made *simultaneously*. The Second Circuit in *Reddington*, 131 F.2d at page 1016, noted that the "net loss" concept would not apply if the 21 sales of blocks of stock in issue had been made to the shareholder on separate dates, and concluded:

> It is difficult to see why such a concept should be implied merely because the sales here were lumped together. Were that regarded as a differentiating fact, it would be easy to avoid the Congressional purpose. And that Reddington's intention was not to avoid taxes cannot be significant. The successful avoidance of the obligation to pay taxes should not, ordinarily, be made to turn on the ability of the Commissioner to show that the taxpayer had no intention to avoid that obligation—in the absence of statutory language, expressly or by clear implication, making that factor the criterion—for otherwise the administration of the tax laws will be rendered too difficult.

Plaintiffs advocate an interpretation of the legislative history of Section 267 contrary to interpretations by the Fifth, Second, and Third Circuits, the Tax Court and the Supreme Court of the United States. Those courts have concluded that Congress, in enacting Section 267 and its predecessor Code sections, chose to include within the ambit of the law those comparatively few and unusual situations which might cause hardships, rather than to create loopholes which would permit tax avoidance or create administrative burdens in enforcing the law. The foregoing cases involved situations where the transfers were found to be at arm's length and the ensuing tax consequences worked unusual hardships on the taxpayers involved. The *Blum* case, supra, involved a transfer of partnership property as a result of a falling out between brothers who were partners.

■ Thus, it is legally immaterial that plaintiff might have had no tax avoidance motive in entering into the transactions in issue, or that the transactions were intended to be simultaneous; the deduction sought by the plaintiff is not allowable.

If the two agreements were truly simultaneous and indivisible, as contended by plaintiffs, and were to have been treated as simultaneous up to the point of sale of the business, then the contract of sale (as distinguished from the earlier agreement to sell) of the building would, under a *relation-back* theory, be *eo instante*, and *not subsequent to* the redemption of the stock. In that case, utilizing the two applicable Code sections, plaintiff would have been selling the building to a corporation in which he directly owned 45% of the stock, as well as constructively owning the 55% owned by his brother.

Thus, even if plaintiffs are correct in their contention that these two agreements were indivisible, they would still have to recognize the gain on the redemption of the stock under Section 302 of the Code, but would have been denied their loss on the sale of the building under Section 267.

Assuming, arguendo, that Congress intended to allow a deduction where two contracts are indivisible and a loss is sustained under one of them, the contracts involved in this case are not indivisible.

The parties to the contract for the redemption of the stock and the parties to the agreement for the sale of the building were not the same. The redemption agreement states:

This is an agreement entered into on June 27th, 1959, by and between Marvin Envelope & Paper Company, an Illinois corporation (hereinafter called "the Company") and Harry C. Caplan.

On the other hand, the agreement for the sale of the building states:

This is an agreement entered into on June 27, 1959, by and between Samuel S. Caplan and Harry C. Caplan.

If the contracts were inseparable and indivisible, they would be unenforceable individually: i. e., a default in one would render the other in default and unenforceable. In this case, however, separate rights and duties were created by each contract, and if the corporation had defaulted in *its* payments to plaintiff, plaintiff would have had no legal right to escape the obligations of his separate contract with his brother. Conversely, had the plaintiff refused to convey the building or comply with the terms of the agreement with his brother, the corporation would not have been relieved of its obligation to continue payments on the stock which it redeemed. Obviously, if Samuel had later transferred his 55% stock interest to X, a stranger to the partnership property agreement, a default by Samuel of the latter would not have relieved X of performing the redemption contract.

It has been stipulated that plaintiff would not have entered into the arrangement in issue unless both agreements were agreed to contemporaneously. The mere simultaneous execution of two contracts does not in the absence of an express agreement make one contract a consideration for the other.

The stock redemption contract intentionally made no mention of the separate agreement between plaintiff and Samuel regarding the sale of the partnership property. In a letter dated April 8, 1959, Samuel's attorney stated, regarding the stock redemption agreement, that Samuel and his wife would "refuse to go on the paper individually, first, because they want to avoid being tied into the deal for tax reasons, and secondly, on general principles." He also said that Samuel had "stated he would not sign the paper as an individual." Thus, Samuel refused to be in any way personally liable or even "tied into" the contract between plaintiff and the corporation. The stock redemption agreement between plaintiff and the corporation provided for various types of security for the performances of the redemption agreement, including pledges of insurance policies and the redeemed stock itself, but did not contain any provision regarding the partnership property in the event of default. Further, the only mention made in the redemption agreement regarding liability by Samuel was in a provision for the sale of certain pledged shares only in the event that the corporation was *later* able to obtain a personal guaranty from Samuel. Samuel intended to insulate himself (personally) from the redemption by interposing the corporation as a separate entity.

An amendment to the original partnership agreement was executed on June 27, 1959. And on October 22, 1959, the parties to the stock redemption agreement executed a five-page amendment to the original redemption agreement. As in the original agreements, neither of these amendments contained any mention of the other contract. Had both parties intended these two agreements to be in consideration of each other, at least one of the contracts or the amendments thereto would have contained some mention of this fact, since the written agreements covered in detail every other material point of discussion between the parties. Neither of the contracts mentioned the other because they were not intended by Samuel (for the reasons expressed by his attorney) to be dependent, related, or in consideration for each other.

The correspondence between the parties reveals that each contract was supported by independent consideration, hav-

ing been separately negotiated and bargained for, and that the monetary consideration for each contract was adequate in and of itself. Furthermore, there is nothing in the record indicating the agreements were intended to be "third party benficiary" contracts.

■ Plaintiffs' contention that because one party would not have entered into the agreement unless it involved the contemporaneous execution of another agreement fuses the two agreements into one, has already been considered and rejected by the Second Circuit in Bard-Parker Co., Inc. v. Commissioner, 218 F.2d 52 (1954), cert. denied, 349 U.S. 906, 75 S.Ct. 582, 99 L.Ed. 1242. In affirming the Tax Court in a situation involving a transfer of assets from an old corporation to a new corporation, where the liquidating directors served as a conduit through which the title passed, the Second Circuit held (218 F.2d pp. 57–58) that:

> There were two separate transfers which did not become transmuted into component steps of a single transfer merely because separate properties were transferred at the same time to one transferee. These two transfers were not—as in the case of the transfer by the old company to its liquidating directors and the re-transfer by them to the new company—mere "procedural" steps towards the completion of one transaction. *Nor were the two transfers, otherwise distinct, fused into one merely because the interested persons would not have entered into the arrangement unless it involved both transfers contemporaneously.* None of the cases cited by the taxpayer leads us to the result that these transactions should escape the tax consequences which would have followed had they been separated in time. (Emphasis supplied.)

This court has recently considered the principle of divisibility of separate contracts in the context of the income tax law in Carlton v. United States, D. C., 255 F. Supp. 812, decided April 26, 1966. That case involved a situation in which taxpay-

ers attempted to recast a sale and immediate repurchase of land into a simultaneous exchange situation in order to receive nonrecognition of gain treatment on the sale. The chief contention of the taxpayers was that they had at all times intended to effect an exchange and not a separate sale and immediate repurchase of properties. The Government stipulated to their contention regarding their intentions, but maintained that what was actually accomplished by the parties should govern the tax consequences of the transaction. In holding for the Government, the court stated (p. 817):

> Plaintiffs have attempted to recast the form and substance of this sale and purchase situation into an exchange situation. This is clear from the record. A taxpayer may arrange his deal so as to come within the scope of Section 1031, Alderson v. Commissioner, supra; *however, intentions alone are not enough. It is what was done, not what might have been done that controls.* Rogers v. Commissioner, 44 T. C. 126, 136. (Emphasis supplied.)

The *Carlton* case is applicable to the instant case and will be followed by this court.

Plaintiff entered into two different types of agreements, each governed by a different section of the Internal Revenue Code of 1954. The stock redemption was taxable under Section 302(a) of the Code, supra, and being thus reported by plaintiff on his tax returns for the year 1959 through the years in suit, received the preferential capital gain treatment provided by that section. The partnership loss is governed by Section 267 of the Internal Revenue Code, supra.

■ A completed transaction is the occasion for a taxable event, and tax consequences are governed by completed transactions. A contract to sell is not a completed transaction, but the sale itself is a completed transaction. Lucus v. North Texas Co., 281 U.S. 11, 50 S.Ct. 184, 74 L.Ed. 668 (1930); Dezendorf v. Commissioner of Internal Revenue, 312 F.2d 95 (C.A.5th 1963); Morco Corp. v. Commissioner of Internal Revenue, 300

F.2d 246 (C.A.2d 1962); Frost Lumber Industries, Inc. v. Commissioner of Internal Revenue, 128 F.2d 693 (C.A.5th 1942); Commissioner of Internal Revenue v. Segall, 114 F.2d 706 (C.A.6th 1940); Commissioner of Internal Revenue v. Union Pac. R. Co., 86 F.2d 637 (C.A.2d 1936); American Land & Inv. Co. v. Commissioner of Internal Revenue, 40 F.2d 336 (C.A.4th 1930). The Section 302 redemption was a *completed transaction* in 1959, and resulted in capital gains upon such completion. On the other hand, the contract between the two brothers was only an agreement to dispose of property *in futuro*, and did not result in a realizable gain nor in a *taxable event* until 1961. Had the 1961 sale of the building resulted in a *gain* instead of a loss, there would have been no way, under the rationale of the cited cases, in which the Government could have required the plaintiffs to report the gain as if the building had actually been sold in 1959. Hence, although there was a taxable event and a completed transaction in 1959 with regard to the redemption agreement, there was no taxable event with regard to the other agreement until 1961. This alone would negate plaintiffs' contention that there was an indivisible taxable event, encompassing both agreements, in 1959.

Neither were these two transactions "step-transactions," with each agreement building upon the other toward one completed transaction, since neither preceded (or "built-upon") the other in the classic tradition of the step-transaction theory.

 Plaintiffs cite McCarty v. Cripe, 201 F.2d 679, a Seventh Circuit decision involving an involuntary conversion, a situation clearly inapplicable to the instant case. Involuntary conversions have always received special treatment under specific provisions of the income tax laws. The plaintiffs' private sale cannot be considered involuntary where they triggered the sale by obtaining the offer on the property from their son-in-law. It should also be noted that the offer established both the year

and the amount of plaintiffs' loss, and hence plaintiffs are in the position of having established the amount of their own loss as well as the time at which such loss should be realized. To allow them a tax deduction in this context would establish the type of loophole in Section 267 which Congress intended to avoid.

In defense of this action the Government has also advanced two additional arguments: (1) that the plaintiffs have waived their right to argue that the two sales were indivisible, and (2) that the deduction claimed by the plaintiffs is disallowed by Section 707(b) (1) of the Internal Revenue Code. In view of the Court's ruling it is unnecessary to rule on either of those contentions.

For the foregoing reasons, judgment is hereby entered dismissing plaintiffs' complaint with prejudice and allowing defendant its costs.

This Memorandum Opinion will constitute the Findings of Fact and Conclusions of Law in this cause.