# THE SHEA COMPANY, A DISSOLVED CORPORATION, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 424–66—429–66.   Filed November 3, 1969.

*Max Thelen, Jr., A. Barlow Ferguson,* and *James R. Bridges,* for the petitioners.

*Eugene H. Ciranni* and *Joel A. Sharon,* for the respondent.

HOYT, *Judge:* Respondent determined deficiencies in the Federal income taxes of petitioners as follows:

---

[1] Cases of the following petitioners are consolidated herewith: Estate of Edmund H. Shea, deceased, Gilbert J. Shea and Edmund H. Shea, Jr., executors, and Margaret M. Shea, docket No. 425–66; Gilbert J. Shea and Lucile M. Shea, docket No. 426–66; Estate of Edmund H. Shea, deceased, Gilbert J. Shea and Edmund H. Shea, Jr., executors, transferee, docket No. 427–66; Gilbert J. Shea, transferee, docket No. 428–66; and Lucile M. Shea, transferee, docket No. 429–66.

| Docket No. | Petitioner | Year | Amount |
|---|---|---|---|
| 424-66 | Shea Co., a dissolved corporation. | 1959 | $57, 144. 01 |
| | | Jan. 1 to Aug. 23, 1962. | 15, 226. 66 |
| 425-66 | Estate of Edmund H. Shea, deceased, Gilbert J. Shea and Edmund H. Shea, Jr., executors, and Margaret M. Shea. | 1962 | 17, 841. 30 |
| 426-66 | Gilbert J. Shea and Lucile M. Shea, husband and wife. | 1962 | 68, 438. 18 |
| 427-66 | Estate of Edmund H. Shea, deceased, Gilbert J. Shea and Edmund H. Shea, Jr., executors, transferee. | 1959 | 57, 144. 01 |
| | | Jan. 1 to Aug. 23, 1962. | 15, 226. 66 |
| 428-66 | Gilbert J. Shea, transferee | 1959 | 57, 144. 01 |
| | | Jan. 1 to Aug. 23, 1962. | 15, 226. 66 |
| 429-66 | Lucile M. Shea, transferee. | 1959 | 57, 144. 01 |
| | | Jan. 1 to Aug. 23, 1962. | 15, 226. 66 |

Upon the joint motion of the parties, these cases were consolidated for consideration by this Court. Docket Nos. 424-66, 427-66, 428-66, and 429-66 involve deficiencies in income taxes of the Shea Co., a dissolved corporation, and transferee liability, in identical amounts, of the three shareholders of the dissolved corporation. Docket Nos. 425-66 and 426-66 involve determinations as to the characterization of certain amounts received by the shareholders in settlement of certain claims which were outstanding at the time of the effective dissolution of the Shea Co.

In the event that we determine that the Shea Co. is liable for deficiencies in income tax for the taxable year 1959 and for the period from January 1, 1962, to August 23, 1962, the parties have stipulated that Gilbert J. Shea, Lucile M. Shea and the Estate of Edmund H. Shea, deceased, Gilbert J. Shea, and Edmund H. Shea, Jr., executors, are liable for such deficiencies, plus interest thereon, as transferees, of the assets of the Shea Co.

Respondent's statutory notices adopt alternative positions. If judgment is rendered for respondent in docket No. 424-66 and the related transferee cases, docket Nos. 427-66, 428-66, and 429-66, then judgment should be rendered for petitioners in docket Nos. 425-66 and 426-66. Conversely, if judgment is rendered for respondent in docket Nos. 425-66 and 426-66, then judgment should be rendered for petitioners in docket Nos. 424-66, 427-66, 428-66, and 429-66.

The issues in this case involve the tax treatment of amounts received upon the settlement of certain contested claims. The claims originated in a joint venture and were eventually distributed to the

members of the joint venture, all of them being corporations. Shortly after this distribution, one of the corporate members liquidated and distributed, among other assets, its share of the contested claims to its shareholders. The issues presented upon these facts are:

(1) Whether the income realized upon the subsequent settlement of the contested claims should be allocated to the final taxable period of the dissolved corporation.

(2) If it is not allocable to the final period of the corporation, whether the shareholders of the dissolved corporation can be required to report the income realized upon the settlement of the claims as distributive shares of partnership ordinary income.

(3) If it is neither allocable to the corporation nor reportable as distributive shares of partnership income, what should be the proper characterization of this income in the hands of the shareholders.

### FINDINGS OF FACT

Some of the facts and exhibits have been stipulated and are incorporated herein by this reference.

The Shea Co. was a Nevada corporation and its principal office during the years in issue was located at Alhambra, Calif. The income tax returns of the Shea Co. for the calendar year 1959 and for the period from January 1, 1962 to August 23, 1962, were filed with the Reno, Nev., district director's office.

Petitioners Gilbert J. and Lucile M. Shea reside in the State of California. Their joint income tax return for the calendar year 1962 was filed with the Los Angeles, Calif., district director's office.

During the periods involved herein Edmund H. Shea and petitioner Margaret M. Shea were husband and wife residing in Alhambra, Calif. Margaret M. Shea continues to reside in Alhambra, Calif. Their joint income tax return for the calendar year 1962 was filed with the Los Angeles, Calif., district director's office. Edmund H. Shea died in 1966 and Estate of Edmund H. Shea, Gilbert J. Shea and Edmund T. Shea, Jr., executors, has been substituted as a proper party in place of Edmund H. Shea in docket Nos. 425–66 and 427–66 by order of court.

The sole stockholders of the Shea Co. during all the years in issue were Gilbert J. Shea, who owned 51 percent of its stock, Lucile M. Shea, who owned 19 percent of its stock, and Edmund H. Shea, who owned 30 percent of its stock. The method of accounting regularly used by the Shea Co., and so used in all the years in question, was the accrual method of accounting.

On March 27, 1957, the Shea Co., Henry J. Kaiser Co., Morrison-Knudsen Co., Inc., Macco Corp., and Raymond Concrete Pile Co. entered into a joint venture agreement associating themselves as a joint

venture (hereafter referred to as the joint venture) for the purpose of constructing the Clear Creek Tunnel near Whiskeytown, Calif., under contract No. 14–06–D with the United States of America, Department of Interior, Bureau of Reclamation (hereafter referred to as the Bureau of Reclamation or the Bureau).

The agreement provided in, pertinent part, as follows:

Now, THEREFORE, in consideration of the mutual covenants hereinafter contained, it is hereby agreed as follows:

1. The parties hereto hereby associate themselves as joint venturers for the purpose of performing and completing the work contemplated by the construction contract. All such work shall be performed under the fictitious name of "Shea-Kaiser-Morrison" and all money, equipment, materials, supplies and other property acquired by the joint venture shall be held jointly in that name.

2. The parties hereto hereby designate The Shea Company, hereinafter called "Shea", as the sponsoring joint venturer and the construction contract shall be carried out and performed on behalf of the joint venture under the direction of Shea, acting through such of its officers, employees or agents as it may hereafter at any time or from time to time designate, and the parties hereto hereby authorize the performance of the construction contract under the direction of the officers, employees and agents of Shea so designated.

3. The interests of the parties hereto in and to any profits and assets derived from the performance of the construction contract, and in and to any property acquired by this joint venture in connection with the work to be performed thereunder, and in and to all contributions required, all moneys received and losses incurred in the performance of the construction contract shall be those percentages set opposite their respective names as follows:

|  | Percent |
|---|---|
| The Shea Company | 30 |
| Henry J. Kaiser Company | 25 |
| Morrison-Knudsen Company, Inc | 20 |
| Macco Corporation | 15 |
| Raymond Concrete Pile Company | 10 |

\*        \*        \*        \*        \*        \*        \*

8. It is specifically understood and agreed between the parties hereto that this joint venture agreement extends only to the performance of the construction contract, together with any changes or additions thereto or extra work thereunder, and in no event shall this agreement extend to or cover any other or different work. The term "construction contract" as used herein is intended to and shall include the changes, additions, or extra work hereinabove mentioned.

9. In the event of the bankruptcy or dissolution of any of the parties hereto, this joint venture shall immediately upon the occurrence thereof cease and terminate. Thereafter, the successors, receivers, trustees, or other legal representatives, hereinafter called "the representatives" of any party so affected shall cease to have any interest in the performance of the construction contract and shall cease to have any interest in and to the joint venture or the assets thereof. In any such case the remaining parties shall have the right to wind up the affairs of the joint venture and in that connection to carry out and complete the performance of the construction contract and upon such completion or sooner termination and receipt of payment of all amounts due under the construction contract, the remaining

joint venturers shall account to the representatives of the party or parties so affected and such representatives shall then be entitled to receive from the remaining joint venturers an amount equal to the sums advanced by the party represented, plus such party's proportionate share of the profits, or less such party's proportionate share of the losses resulting from the performance of the construction contract to the date of such termination of the joint venture; provided, however, that the profit or loss computed as of the date of such termination shall be in the same proportion to the whole profit or loss resulting from the performance of the construction contract as the amount of work done thereunder at such time bears to all of the work which is done thereunder * * *

 *         *         *         *         *         *         *

10. No party hereto shall sell, assign or in any manner transfer its interest in the joint venture without first obtaining the consent of the other parties hereto.

 *         *         *         *         *         *         *

Except as herein provided, this agreement shall inure to the benefit of and be binding upon the parties hereto, their successors, trustees and assigns, but shall not inure to the benefit of any other party or corporation.

At the time of its construction, the Clear Creek Tunnel was the largest tunnel ever built in California. A $44 million construction project, the tunnel was 11 miles long and approximately 20 feet in diameter. It took approximately 5 years to complete the project and employment, at its peak, involved more than 400 men.

The Shea Co. was the "sponsoring joint venturer" of the Clear Creek Tunnel joint venture and, as such, accounted to the other members of the joint venture. In the construction industry a "sponsoring joint venturer" is the member of the joint venture who is designated by the other venturers as the construction manager, responsible for prosecuting the work of the joint venture.

John F. Shea was the project manager of the Clear Creek Tunnel project. He was also a director of the Shea Co. during the years at issue, and exercised the sole managerial authority over the Clear Creek Tunnel project. Although John is not an accountant, all monthly, yearly, and final financial statements relating to the project, were examined by and cleared with him before they were prepared in final form and disseminated to the members of the joint venture.

In most instances when moneys were paid to the joint venture by the Bureau of Reclamation, John, in his capacity as project manager, signed vouchers or receipts for such moneys. The Bureau of Reclamation accepted his signature on these vouchers or receipts because he had a power of attorney to execute such documents for the joint venture.

On December 29, 1958, the Shea Co. adopted a plan of complete liquidation, which provided, among other things, that from the date of the adoption of the plan the corporation would not solicit or undertake any new business of any kind, that the corporation would complete its required performance under then existing contracts and

commitments, specifically including all required performances in connection with the joint venture, that all distributions made under the plan would, in the aggregate, be made in full payment in exchange for, and in cancellation and redemption of, all of the outstanding capital stock of the corporation, and that it was contemplated that the complete liquidation of the corporation would be accomplished within 3 years.

The plan of complete liquidation was adopted because the health of the two principal shareholders of the Shea Co., Gilbert J. Shea and Edmund H. Shea, was poor. They were both getting older and wished to retire from the construction business. The Shea Co. did not undertake any new business after the adoption of the plan of complete liquidation.

On December 22, 1960, the plan of complete liquidation was amended by the Shea Co. to provide that it was contemplated that the complete liquidation of the Shea Co. would be accomplished by December 31, 1962.

In December 1959, the joint venture notified the Bureau of Reclamation that it had encountered changed conditions within the meaning of a clause of the contract. In a subsequent letter dated December 8, 1961, the joint venture requested the Bureau of Reclamation to make an equitable adjustment of $2,408,614.98 in compensation for the increased costs which were incurred as a result of the changed conditions. The letter stated, in pertinent part, as follows:

As a result of the encountering of these physical conditions which differed materially from those indicated in the contract and which were unknown physical conditions of a highly unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of this character, we were required to incur excessive increased costs in order to permit us to continue driving and concreting the tunnel. It became necessary to perform many expensive operations which otherwise would not have been required and which were not anticipated by either party to the contract.

  *   *   *   *   *   *   *

We request that you make the equitable adjustment required by Clause 4 of the General Provisions and modify our contract by increasing the amount due thereunder by $2,408,614.98 and extending the time for performance by 134 calendar days. In this connection, we request that you give us an opportunity to discuss this matter with you at which time we will be pleased to answer any questions which you may have, and we will present further details in support of our right to this equitable adjustment.

After its acceptance on March 12, 1962, of the Clear Creek Tunnel, the Bureau in a letter, dated March 23, 1962, discussed the joint venture's claim of changed conditions. The letter read as follows:

Your claim of changed conditions as set forth in your letter dated December 8, 1961, has been reviewed. The conditions encountered on this work are not

considered to be so materially different from those indicated in the contract or ordinarily encountered in such work as to constitute changed conditions within the meaning of Clause No. 4 of the contract. Accordingly, there appears to be no basis for an adjustment in contract price.

\*     \*     \*     \*     \*     \*     \*

Your letter dated December 8, 1961, requests an opportunity to discuss the claim of changed conditions. I will be pleased to meet with you at your convenience. If you then wish to pursue these claims further, it will be necessary to issue a Findings of Fact and decision of the contracting officer.

In a letter dated March 29, 1962, John F. Shea, as project manager for the joint venture, requested the Bureau of Reclamation to make a findings of fact. The letter indicated the joint venture's interest in having the findings of fact expedited by the Bureau of Reclamation.

At the time of acceptance of the Clear Creek Tunnel in March 1962, John F. Shea was of the opinion that the Bureau of Reclamation would possibly offer as much as $500,000 in settlement of the claims against it.

The joint venture was insured for workmen's compensation with the Industrial Indemnity Co. The policies were obtained through Underwriters Service, Inc., an insurance broker. A letter dated May 20, 1957, from Industrial Indemnity Co. to the above-named insurance broker regarding the workmen's compensation policies for the joint venture provided, in material part, as follows:

This will confirm our understanding that the Workmen's Compensation policy cited above and any other policies of Workmen's Compensation which may be in effect between this company and the policyholder during the period starting at the above inception date and continuing to the completion of the Clear Creek Power Conduit, Trinity County and Shasta County, California, but not more than six years, and primarily covering operations at the project sites or related directly thereto, will be assigned to a special dividend plan. Under this plan, *which is subject to discretion of the Board of Directors, as provided in the participating provisions of the policy,* the policyholder can expect to receive dividend consideration as set forth in this letter.

\*     \*     \*     \*     \*     \*     \*

The policies will be subject to dividend nine months after the normal expiration date of the final policy written for this project.

Under the plan, dividend will be computed by subtracting from compensation earned premium the total of retention plus 108.4% of incurred losses. Incurred losses shall mean losses and loss reserves, including medical contract and allocated claims expense, as determined by the company and based upon the figures shown at that time on its records.

*Any right to dividend, of course, is subject to the terms of the respective policies* and to all state and federal laws and regulations. This plan is contingent upon the company making a distributable underwriting profit. Consequently, the dividends on policies written under this plan will not at any event exceed that portion of the over-all underwriting profit that this company determines to be distributable to policyholders.

As you know, no carrier can legally guarantee any dividend or the exact costs affecting its determination, but this plan is based upon Industrial Indemnity Company's long experience in successfully underwriting compensation business. [Emphasis supplied.]

The terms and conditions concerning any possible dividend had also been discussed in an earlier letter dated February 20, 1957.

The participating provision referred to in the May 20, 1957, letter, and which appeared in each of the workmen's compensation insurance policies, provided as follows:

### (PARTICIPATING PROVISION)

The insured may be entitled to a dividend which shall represent such proportion of any distributable surplus of the company as may be provided in such authorized dividend plan *as may hereafter be adopted at the sole discretion of the Board of Directors of the company after the expiration of the policy period to which the dividend is applicable* and made applicable to this policy, such dividend to be computed and paid at such time and subject to such conditions as shall be set forth in such plan. However, no dividend shall accrue or become payable hereunder (1) if the insured shall have breached any condition, covenant, or provision of this policy; or (2) if any part of the premium hereunder shall remain unpaid after written demand therefor, or in any event for a continuous period of ninety days following date of a statement therefor mailed or delivered to the insured; or (3) if the books or records of the insured are not available for audit or are not in such condition that the premium can be ascertained; or (4) if any report of remuneration or other data upon which premium is based is not submitted to the company within ten days after written demand therefor mailed or delivered to the insured; or (5) if suit is brought by the company or its assignee to enforce collection of any part of the premium hereunder; or (6) if the insured shall owe to the company at the time set for such computation and payment any delinquent amounts, whether arising under this policy or otherwise; or (7) if the total premium paid hereunder shall be less than the minimum amount specified in such plan; or (8) if such dividend is less than $2.50. In no event shall any dividend accrue or become payable which is greater than the amount by which the earned premium exceeds the Minimum Premium. [Emphasis supplied.]

Subsequent to the completion of the project, Underwriters Service, Inc., in a letter dated May 9, 1962, requested that Industrial Indemnity Co. prepare a loss experience exhibit and dividend calculation. The letter stated, in material part, as follows:

The job is now completed and we understand but few open claims remain. Your proposal provided for either yearly or job-end dividends. Mr. Shea now advises that they will probably require these dividends in the very near future and in order to have such available we ask that you prepare loss experience exhibit and dividend calculation—which we estimate at $375,000—for our study. May we have your immediate attention in this regard.

A letter, dated May 23, 1962, from Underwriters Service, Inc., to Industrial Indemnity Co. regarding the dividend calculation, read in part as follows:

Dick Morris called late this afternoon re my inquiry on the compensation premium adjustment of the captioned job.

After discussing some detail about when the current policy would be terminated, review of open claims nine months after termination, how returns should be effected, etc. Dick questioned whether the $375,000 estimate noted in my letter to you of May 9 contemplated "cuts".

At this point I blew my top! I told Dick this afternoon, and I wish to confirm to you here, than an agreement was made between you and me early in 1957 for the premium formula to be used on the Trinity project. We intend to live up to this agreement 100 per cent and will be responsible to see that our Assureds do likewise. We expect the same from Industrial Indemnity.

If there is any thought in your mind that our original agreement is to be abrogated in any form or degree we should be advised of your intentions immediately. If, as I believe, Industrial intends to stand behind our agreement I would appreciate the detail requested in my letter of May 9 at your early convenience.

Upon acceptance of the Clear Creek Tunnel the joint venturers decided to wind up all business and affairs of the joint venture and to distribute all remaining assets to the venturers. On March 15, 1962, the joint venture, all of the corporate venturers and J. F. Shea Co., Inc., entered into an agency agreement which provided, in material part, as follows:

### AGREEMENT

THIS AGREEMENT, by and between J. F. SHEA CO. INC., as Agent, hereinafter referred to as "Agent"; SHEA-KAISER-MORRISON (Clear Creek Tunnel Joint Venture), hereinafter referred to as the "Joint Venture"; and THE SHEA COMPANY, HENRY J. KAISER COMPANY, MORRISON-KNUDSEN COMPANY, INC., MACCO CORPORATION, and RAYMOND INTERNATIONAL, INC., the latter five corporations sometimes hereinafter jointly referred to as the "Venturers";

### WITNESSETH

WHEREAS, the Joint Venture has completed construction of the Clear Creek Tunnel project, and desires to wind up and liquidate; and

WHEREAS, the Joint Venture owns various items of plant, buildings, facilities, and office and construction equipment, and believes that liquidation thereof will be facilitated *by conveying the same to an agent, for liquidation on behalf of the Venturers, rather than by distributing undivided interests therein to the Venturers, and J. F. SHEA CO., INC. is willing to act as such Agent.*

Now, THEREFORE, it is agreed as follows:

1. Joint Venture hereby assigns, transfers, conveys and sets over to Agent, *as agent for Venturers*, all of its right, title and interest in and to all the plant, buildings, facilities, and office and construction equipment (hereinafter sometimes referred to as the "property") owned by the Joint Venture at March 15, 1962, receipt of which is hereby acknowledged by Agent, for the uses and purposes and upon the terms and conditions hereinafter set forth.

2. The purpose and intent of this Agreement is to convert all of the property into cash, and to accomplish the same, Agent agrees forthwith to proceed in an orderly manner to sell said property at such times, and from time to time

and for such price, and on such terms and conditions as in its sole and unrestricted discretion Agent shall deem appropriate.

3. The Agent is hereby given and granted the following rights, powers and authority * * * .

(a) To sell, convey, assign, transfer, set over and otherwise dispose of, in the name of and on behalf of the Joint Venture, any and all property which by this Agreement has been distributed to it as Agent; to give quitclaim, grant or other deeds and bills of sale therefor, with or without warranty, and in any other manner to transfer title to any and all of said property;

\*      \*      \*      \*      \*      \*      \*

4. The Agent shall, from time to time, distribute the net proceeds from liquidation of the property to the Venturers in the following proportions:

|  | Percent |
| --- | --- |
| The Shea Company | 30 |
| Henry J. Kaiser Company | 25 |
| Morrison-Knudsen Company, Inc | 20 |
| Macco Corporation | 15 |
| Raymond International, Inc | 10 |

Each interim distribution shall consist of not less than 75% of the net proceeds received from transactions hereunder to the date of such distribution. At the time of each such distribution, the Agent shall render to each of the Venturers an accounting of its transactions, and upon the final distribution of proceeds, shall render a final accounting to each of said Venturers.

\*      \*      \*      \*      \*      \*      \*

7. The Joint Venture agrees to execute and deliver unto the Agent all bills of sale, deeds, conveyances, assignments, further assurances, and other appropriate documents as may be necessary or desirable to fully vest title in and to all of the property in the Agent for the purposes of this agreement.

\*      \*      \*      \*      \*      \*      \*

10. This agreement shall be binding upon and shall inure to the benefit of the successors and assigns of all the parties hereto.

[Emphasis supplied.]

In addition to serving as the project manager of the Clear Creek Tunnel construction for the joint venture, John F. Shea was also the president and a director of the agent, J. F. Shea Co., Inc.

On or before May 16, 1962, all of the assets of the joint venture were transferred to J. F. Shea Co., Inc., as the agent for the Shea-Kaiser-Morrison venturers. These assets consisted of cash, accounts receivable, and physical assets. Included in these assets were the claims against the Bureau of Reclamation, made prior to May 16, 1962, for changed conditions encountered in the performance of the work and extra work performed prior to May 16, 1962, on the Clear Creek Tunnel project of $2,509,220.18, and the claim against Industrial Indemnity Co. made prior to May 16, 1962, for workmen's compensation policyholders' dividends in the amount of $375,000.

No actual physical transfer of assets from the joint venture to J. F. Shea Co., Inc., occurred. The transfer of assets was evidenced by book-keeping entries made by office employees of J. F. Shea Co., Inc. Although there were no other documents of transfer, the agency agreement of March 15, 1962, was executed whereby the joint venture assigned, transferred, conveyed, and set over to J. F. Shea Co., Inc., all of its right, title, and interest in the physical assets of the joint venture.

A "Report on Examination as at May 16, 1962," pertaining to the joint venture, which was prepared by certified public accountants, was distributed to and received by the Shea Co., Henry J. Kaiser Co., Morrison-Knudsen Co., Inc., Macco Corp., and Raymond International, Inc., prior to July 6, 1962. This report included a balance sheet for the joint venture as of May 16, 1962. This balance sheet did not list claims of the joint venture pending against the Bureau of Reclamation or against the Industrial Indemnity Co. as joint venture assets.

An Agreement dated May 16, 1962, was prepared and transmitted by letter dated July 6, 1962, signed by a partner in a San Francisco law firm, to Henry J. Kaiser Co., with copies to the Shea Co., Morrison-Knudsen Co., Inc., Macco Corp., and Raymond International, Inc. (successor to Raymond Concrete Pile Co.). The letter stated, in pertinent part, as follows:

You will have received a copy of the audit of the books of the Shea-Kaiser-Morrison Joint Venture to May 16, 1962, the date of winding up the joint venture as prepared by Serene, Koster & Barbour.

As you will recall any remaining materials, equipment and supplies have been transferred by the Shea-Kaiser-Morrison Joint Venture to the individual joint venturers as joint owners and the joint owners have appointed J. F. Shea Investment Co., Inc. as agent to dispose of such property for their joint account. *Any receivables such as retained percentage, claims against the Bureau of Reclamation or possible refunds of Workmen's Compensation Insurance have likewise been assigned by the joint venture to the individual joint venturers as joint owners.* [Emphasis supplied.]

Following the winding up of the joint venture it is in order to have an agreement acknowledging the accounting and there is enclosed original and five copies of such an agreement. If agreeable with you, will you please sign and forward for further signatures.

The enclosed agreement provided, *inter alia*, as follows:

### AGREEMENT

This AGREEMENT, made and entered into as of the 16th day of May, 1962, by and among THE SHEA COMPANY, HENRY J. KAISER COMPANY, MORRISON-KNUDSON COMPANY, INC., MACCO CORPORATION and RAYMOND INTERNATIONAL, INC., sometimes hereinafter jointly referred to as the "Venturers",

WITNESSETH

WHEREAS, the parties hereto have, by agreement dated March 27, 1957, created the SHEA-KAISER-MORRISON JOINT VENTURE for the purpose of performing the construction contract with the United States of America, Department of Interior, Bureau of Reclamation, for the construction of the Clear Creek Tunnel, Trinity River Division, Central Valley Project, California; and

WHEREAS, the Joint Venture has completed performance of said Construction Contract, and has rendered a final accounting to the venturers,

NOW THEREFORE, IT IS AGREED AS FOLLOWS:

1. Each of Venturers hereby acknowledges receipt from SHEA-KAISER-MORRISON JOINT VENTURE, and from THE SHEA COMPANY, as sponsor thereof, of all amounts due each of them on final accounting of the affairs of the Joint Venture and of Venturers, it being acknowledged and agreed that distribution of the physical assets owned by the Joint Venture has been effected by distribution in kind of such assets to J. F. SHEA CO., INC. as agent for the Venturers, for sale or other disposition for the account of the Venturers.

2. Each of the Venturers hereby releases each and all of the others and the SHEA-KAISER-MORRISON JOINT VENTURE from any and all claims or liabilities of any nature whatsoever in connection with the Joint Venture Agreement dated March 27, 1957, and the business and affairs of the Joint Venture created thereunder.

The evidence of record fails to disclose whether or when this agreement was executed by the above-mentioned parties to whom it was transmitted.

A partnership income tax return (Form 1065) for the period from January 1, 1962, to May 17, 1962, marked "FINAL RETURN", was filed on behalf of the joint venture with the Los Angeles, Calif., district director's office. Copies of that return were distributed to and received by the Shea Co., Henry J. Kaiser Co., Morrison-Knudsen Co., Inc., Macco Corp., and Raymond International, Inc., prior to August 15, 1962.

During the course of the construction of the Clear Creek Tunnel project the joint venture claimed income tax deductions for expenses incurred with respect to insurance premiums and construction costs.

On June 30, 1962, pursuant to its plan of complete liquidation, as amended, the Shea Co. made its final distribution in liquidation of all of its remaining assets to its shareholders. As a part of that distribution, the Shea Co. distributed its undivided 30-percent interest in the former assets of the joint venture then held by the Shea Co.'s agent, J. F. Shea Co., Inc., to its shareholders, and thereupon J. F. Shea Co., Inc., became the agent of the shareholders of the Shea Co. in dealing with their interest in said assets.

A release on contract was executed in July, 1962, and transmitted to the Bureau of Reclamation by letter signed by John F. Shea and dated July 19, 1962. This letter specifically excepted seven items of

claim for extra work not authorized for payment by the Bureau of Reclamation.

The Shea 'Co. was formally dissolved under the laws of the State of Nevada on August 23, 1962, and its "Certificate of Surrender of Right to transact Intrastate Business in California" was filed in the State of California on that date.

The entire amount of the claims against the Bureau of Reclamation and Industrial Indemnity Co. was contested on May 16, 1962, on June 30, 1962, and on August 23, 1962. At no time prior to August 24, 1962, in the case of the claims against the Bureau of Reclamation, and at no time prior to September 29, 1962, in the case of the claim against Industrial Indemnity Co., had any offer of compromise or settlement been made by any of the respective parties.

At a meeting held on August 24, 1962, at the offices of the Bureau of Reclamation, called at their request, several offers of settlement were discussed. Finally Bureau personnel offered a lump sum of approximately $340,000 in full settlement of all claims for changed conditions and extra work which were approximately for $2,500,000. This meeting was attended by Bureau of Reclamation personnel, by John F. Shea, and by petitioner Gilbert J. Shea. John F. Shea orally agreed at this meeting to accept the Bureau's offer. Upon receipt of a final estimate from the Bureau of Reclamation which allowed for $335,914.19 in net earnings, John F. Shea executed a release on contract, dated October 4, 1962, with no exceptions.

After three meetings in September 1962 between personnel of Industrial Indemnity Co. and the insurance brokers, Underwriters Service, Inc., Industrial Indemnity Co. offered to settle the claim for workmen's compensation policyholder dividends for $203,059.43. Upon the advice of Todd Woodell of Underwriters Service, Inc., and petitioner Gilbert Shea, John F. Shea accepted the offer. Woodell had written a letter to Gilbert Shea dated October 3, 1962, where he recommended "liquidating an asset of the Joint Venture immediately" on the ground that "it is certainly an advantage to the joint venture to close the compensation policies at this time."

John F. Shea's acceptance of the offer was communicated through Underwriters Service, Inc., in a letter dated November 5, 1962, and captioned as in regard to the "Shea-Kaiser-Morrison-Clear Creek Project."

During the period from May 18, 1962, through December 18, 1962, J. F. Shea Co., Inc., converted into cash all of the assets which it held as agent for each of its principals and paid liabilities, which the joint venture had incurred up to the time of the distribution of all its assets, in the total amount of $60,087.29. The specific assets con-

verted into cash and the amounts received therefor by J. F. Shea Co., Inc., during this period were as follows:

(a) Received a payment in the total amount of $6,722.34 from the Bureau of Reclamation for extra work performed by the joint venture prior to May 16, 1962. This payment was received on June 7, 1962.

(b) Received payments on sales and involuntary conversions of equipment and plant in the total amount of $33,016.84 in excess of the aggregate basis which the joint venture had had in such plant and equipment prior to their transfer to J. F. Shea Co., Inc.

(c) Received payments on sales of materials and supplies in the total amount of $11,516.78 in excess of the aggregate basis which the joint venture had had in such materials and supplies prior to their transfer to J. F. Shea Co., Inc.

(d) Received the payment of $335,914.19 from the Bureau of Reclamation in settlement of all claims against the Bureau, all of which claims had been made prior to May 16, 1962.

(e) Received the payment of $203,059.43 from Industrial Indemnity Co. on November 13, 1962, in settlement of all claims against the company, all of which claims were made prior to May 16, 1962.

(f) Received miscellaneous amounts totaling $1,242.06.

J. F. Shea Co., Inc., also received payments for the rental of equipment in the total amount of $20,245.71. J. F. Shea Co., Inc., itself, was the lessee of some of this equipment.

The majority of the physical assets held and converted into cash by J. F. Shea Co., Inc., acting as agent for each of its principals, was tunnel equipment of a highly specialized nature which could be sold for a fair price only to a contractor with a need for this particular type and size of equipment. Such tunnel equipment was eventually sold to a joint venture in which J. F. Shea Co., Inc., was a member and the sponsor. The purchasing joint venture was a recent and successful bidder on another tunnel project in the same area as the Clear Creek Tunnel project. J. F. Shea Co., Inc., as agent, would have attempted to sell such equipment to whomever was the successful bidder on the other tunnel project.

J. F. Shea Co., Inc., accounted to Gilbert J. Shea, Lucile M. Shea, Edmund H. Shea, Henry J. Kaiser Co., Morrison-Knudsen Co., Inc., Macco Corp., and Raymond International, Inc., for all amounts received by it.

During the period from May 18, 1962, through December 18, 1962, J. F. Shea Co., Inc., incurred operating expenses as agent in the total amount of $56,356.95 which it deducted, together with the payments of preexisting liabilities totaling $60,087.29 mentioned above, in accounting to the parties and determining the total aggregate amount

distributable to said parties ($1,572,128.85). The operating expenses included salaries and payroll taxes, insurance, office expenses and supplies, professional services, telephone and telegraph expenses, yard and warehouse expenses, equipment repair and maintenance expenses, personal property taxes, and miscellaneous expenses.

J. F. Shea Co., Inc., formally terminated the agency which had been created by the agreement of March 15, 1962, by making cash distributions on December 18, 1962, in the total amount of $1,572,128.85 to its principals. This total amount exceeded the total net value at which the joint venture carried its assets on its books, as of May 16, 1962, by $555,360.40 (which amount of $555,360.40 is hereafter referred to as the "excess amount").

Gilbert J. Shea, Lucile M. Shea and Edmund H. Shea, as the assignees of the Shea Co., received in proportion to their respective stockholdings in the Shea Co. on June 30, 1962, 30 percent of the total distribution, or $471,638.66. Of this amount, Gilbert J. Shea received $240,535.72, Lucile M. Shea received $89,611.34, and Edmund H. Shea received $141,491.60. Of the amount received by Gilbert J. Shea, $84,970.16 constituted his prorata share of the excess amount; of the amount received by Lucile M. Shea, $31,655.54 constituted her prorata share of such excess amount; of the amount received by Edmund H. Shea, $49,982.45 constituted his prorata share of such excess amount. None of the excess amounts set forth above were reported by the Shea Co. on its income tax return for the period January 1, 1962, to August 23, 1962.

Of the excess amount of $555,360.40 received by J. F. Shea Co., Inc., as agent during the period May 18, 1962, through December 18, 1962, $33,016.84 ($9,905.05 being allocable to the original 30-percent interest of the Shea Co.) constituted capital gain regardless of the ultimate recipients of said amount.

A letter dated December 24, 1962, from the law firm which prepared the agreement of May 16, 1962, mentioned above, was addressed to Gilbert J. Shea, Lucile M. Shea, and Edmund H. Shea, and transmitted checks in the respective amounts set forth above. The letter read, in material part, as follows:

J. F. Shea Co., Inc., as Agent for you and the other participants in the Shea-Kaiser-Morrison Joint Venture, has wound up the affairs of the joint venture as per the enclosed statement and has on hand for distribution the total net sum of $1,572,128.85.

The Shea Company would be entitled to 30% of this distribution. However, The Shea Company has been dissolved and you are assignees of that company's interest in the said distribution.

At the time of trial John F. Shea was the president and project manager of J. F. Shea Co., Inc. In addition, he was a stockholder in that company and a member of its board of directors. Neither petitioner Gilbert J. Shea, nor petitioner Lucile M. Shea, nor Edmund H. Shea had any financial interest in J. F. Shea Co., Inc., at any time during the years in question.

J. F. Shea Co., Inc., was organized in the early part of 1958 and was in existence nearly a year before the plan of liquidation was adopted by the Shea Co.

Although J. F. Shea Co., Inc., made bids on construction contracts soon after it was organized, it never received any construction contracts until 1962, and it never performed any construction work until 1962.

John Shea, in seven letters to the Bureau of Reclamation dated July 19, 1962, set out the details of the claims pertaining to the joint venture's tunnel construction project. These letters were signed "John F. Shea, Project Manager." A change order from the Bureau of Reclamation, dated August 30, 1962, was accepted and signed by John F. Shea in the same manner as the above-mentioned letters. The final release, dated October 4, 1962, was signed "John F. Shea."

All of the letters from the joint venture to the Bureau of Reclamation in regard to the claims prior to May 16, 1962, were signed in the following manner:

"SHEA-KAISER-MORRISON, JOHN F. SHEA, *Project Manager.*"

All of the correspondence and change orders from the Bureau of Reclamation regarding the Clear Creek project claims, both prior and subsequent to May 16, 1962, were addressed to Shea-Kaiser-Morrison.

The Shea Co., on its final Federal income tax return for the short period commencing January 1, 1962, and terminating August 23, 1962, reported a net operating loss of $109,892.33 which was computed, in summary, as follows:

*Gross income*

| | | |
|---|---:|---:|
| Income from joint venture: | | |
| Shea-Kaiser-Morrison: | | |
| Ordinary income (loss) | ($66, 414. 84) | |
| Sec. 1231 gain | 25, 856. 69 | |
| | | ($40, 558. 15) |

*Deductions*

| | |
|---|---:|
| Payroll, rent, interest, contributions, etc | ($69, 334, 18) |
| | |
| Net operating loss | (109, 892. 33) |

An application was made for a tentative carryback adjustment of the above net operating loss to the calendar year 1959.

Respondent's notice of deficiency to the Shea Co. provided, in pertinent part, as follows:

The application for tentative carryback adjustment filed by you requesting a deduction of $109,892.33 for the taxable year ended December 31, 1959 based on a net operating loss carryback from the taxable year January 1, 1962 to August 23, 1962 is denied since it has been determined that you did not sustain a net operating loss in the taxable year January 1, 1962 to August 23, 1962 as explained elsewhere herein.

### EXPLANATION OF ADJUSTMENTS

(a) It has been determined that you realized ordinary income from the J. F. Shea Co., Inc. Agency Account in the amount of $156,703.07 which you failed to report in your income tax return. Accordingly, taxable income is increased $156,703.07.

(b) It has been determined that you realized capital gain income in the amount of $35,761.74 in lieu of $25,856.69 reported in your income tax return. Accordingly, taxable income is increased $9,905.05, representing your share of capital gains from the J. F. Shea Co., Inc. Agency Account, which you failed to report in your income tax return.

Edmund H. Shea and petitioner Margaret M. Shea, on their joint Federal income tax return for the calendar year 1962, reported a long-term capital gain upon the liquidation of the Shea Co. of $169,628.79.

Respondent's notice of deficiency to Edmund H. Shea and petitioner Margaret M. Shea provided, in material part, as follows:

### EXPLANATION OF ADJUSTMENTS

(a) It has been determined that you realized ordinary income from the J. F. Shea Co., Inc. Agency Account in the amount of $45,924.51. Since you reported this amount as capital gain, [as part of the reported $169,628.79 capital gain] your taxable income is increased $45,924.51 and appropriate adjustment is made to capital gain income * * *

Petitioners Gilbert J. Shea and Lucile M. Shea, on their joint Federal income tax return for the calendar year 1962, reported a long-term capital gain upon the liquidation of the Shea Co. of $395,800.47.

Respondent's notice of deficiency to petitioners Gilbert J. Shea and Lucile M. Shea provided, in pertinent part, as follows:

### EXPLANATION OF ADJUSTMENTS

(a) It has been determined that you realized ordinary income from the J. F. Shea Co., Inc. Agency Account in the amount of $107,157.18. Since you reported this amount as capital gain, [as part of the reported $395,800.47 capital gain] your taxable income is increased $107,157.18 and appropriate adjustment is made to capital gain income * * *

#### ULTIMATE FINDINGS OF FACT

The joint venture ceased to do business on May 16, 1962; thereafter, no part of any of its business, financial operation, or venture was car-

ried on by any of the venturers but instead all assets and liabilities of the joint venture were held by J. F. Shea Co., Inc., agent for the respective venturers to liquidate their interests, pay their liabilities, and remit the net shares realized when the task was concluded.

The Shea Co. ceased doing business when the joint venture was terminated and on June 30, 1962, distributed all of its assets to its shareholders in exchange for their stock pursuant to its plan of complete liquidation; it had no assets on August 23, 1962, when it was formally dissolved under Nevada law, surrendered its right to do business in California, and ceased to exist for all purposes. The fair market value of the contested claims or the prorata interests of the shareholders therein could not be reasonably ascertained on either of these dates.

### OPINION

A plan of complete liquidation of the Shea Co. was adopted on December 29, 1958, and later amended on December 22, 1960. It was stated and recognized in the plan that the liquidation and dissolution of the corporation would take place as soon after the completion and acceptance of the Clear Creek Tunnel project as the board of directors deemed proper. On June 30, 1962, pursuant to its plan of complete liquidation, the final distribution in liquidation of all of its remaining assets was made to its shareholders. As a part of that distribution, the Shea Co. distributed its undivided 30-percent interest in the assets of the former joint venture in which it had participated as a member and sponsor. The former assets of the joint venture were comprised, in good part, of two contested claims against the Bureau of Reclamation and the Industrial Indemnity Co. It is the treatment of the subsequent settlement of these two disputed claims which gives rise to the issues before us.

Initially, we must decide whether the income realized upon the subsequent settlement of the claims should be included in the taxable income of the Shea Co. for its final short period ending August 23, 1962. If this initial issue is decided in the negative, we must then determine whether the shareholders of the dissolved Shea Co. can be required to report the income realized upon the settlement of the claims as distributive shares of partnership ordinary income. If this issue is also decided in the negative, a further and final question arises as to the proper characterization of the income from the settlement of the claims in the hands of the shareholders of the dissolved Shea Co.

Respondent's contentions are in the alternative. He initially contends that the income realized upon the settlement of the claims must be "allocated" to the Shea Co. for its final short period ending

August 23, 1962, in order "to clearly reflect its income" for that period, Petitioners, on the other hand, contend that by virtue of the fact that that this income was not realized or accruable as of August 23, 1962, it cannot properly be included in the Shea Co.'s taxable income for that period. Respondent alternatively contends that under section 708(b)(1)(A)[2] the joint venture did not effectively terminate until December 18, 1962, when the J. F. Shea Co., Inc., as agent for the joint venture, terminated the agency by making final cash distributions to the joint venturers, including the shareholders of the Shea Co., who stood in the shoes of their dissolved corporation as joint venturers. Petitioners, to the contrary, contend that the evidence establishes that the joint venture was effectively terminated as of May 16, 1962, and that the J. F. Shea Co., Inc., was acting as an agent solely in behalf of the former members of the terminated joint venture.

Section 446(c) includes the accrual method among the permissible methods of computing taxable income. The Shea Co. employed this method in all the years in question. Under the accrual method, income is included for the taxable year when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. Sec. 1.446–1(c)(1)(ii), Income Tax Regs; *Security Mills Co.* v. *Commissioner*, 321 U.S. 281 (1944). A fixed right to receive income does not necessarily mean a right to receive income immediately. It more closely contemplates an undisputed right to receive income, immediately or in the future, whereby the party has completed all or part of a contract and there is an ascertainable and demonstrable value resulting from the completion of such work. *Alden Charles Palmer*, 29 T.C. 154, 172 (1957), affd. 267 F. 2d 434 (C.A. 9, 1959) ; *United Mercantile Agencies*, 34 T.C. 808, 817 (1960). These principles of the accrual method are equally applicable to the final period of an accrual basis corporation which dissolves and ceases to exist for tax purposes. *Henry Hess Co.*, 16 T.C. 1363 (1951), reversed on other grounds 210 F. 2d 553 (C.A. 9, 1954).

The facts of the case before us make it quite obvious that the claims against the Bureau of Reclamation and Industrial Indemnity Co. did not give rise to any accruable income of the Shea Co. for the short

---

[2] SEC. 708. CONTINUATION OF PARTNERSHIP.

(a) GENERAL RULE.—For purposes of this subchapter, an existing partnership shall be considered as continuing if it is not terminated.

(b) TERMINATION.—

(1) GENERAL RULES.—For purposes of subsection (a) a partnership shall be considered as terminated only if—

(A) no part of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners in a partnership, or

All references are to the Internal Revenue Code of 1954.

period ending August 23, 1962. Our findings amply disclose the contested nature of the claims which the Shea Co. had against the Bureau of Reclamation and the Industrial Indemnity Co. It is the very nature of these claims that negates the possibility that the Shea Co. had what may be considered undisputed or fixed rights to receive income prior to its liquidation and dissolution. At the final date of dissolution, August 23, 1962, there was a conspicuous absence of those events which were necessary to fix the Shea Co.'s rights to receive any income of an ascertainable amount from these claims. It was the settlements occurring after August 23, 1962, which resulted in the fixing of rights to receive such ascertainable amounts of income. A corporation, such as the Shea Co., which has adopted a plan of liquidation, distributed all of its assets to its shareholders, and dissolved under State law, has ceased to exist for tax purposes and has no tax liability for income accruing thereafter when the disputed claims are settled. *James Poro*, 39 T.C. 641 (1963), acq. 1963-2 C.B. 5.

The fact that the preliminary settlement of the claims against the Bureau of Reclamation was reached on August 24, 1962, only 1 day after the formal dissolution of the Shea Co., might give rise to immediate suspicion that the claims were settled or could have been settled prior to or on the dissolution date. However, there is not a scintilla of evidence that this was the case and this suspicion alone, in the absence of any evidence to cast doubt on the bona fides of the date of settlement of these claims, is not sufficient to warrant a finding that the claims were settled prior to August 24, 1962.

Actually the evidence does not establish that the claims were settled and accrued income therefrom became fixed on August 24, 1962. On that date an oral agreement as to an approximate settlement figure was reached at a long conference attended by representatives of the contesting parties. The settlement itself was not made until a later date; the final contract change order was dated August 30, 1962, and sent to Shea-Kaiser-Morrison on September 19, 1962, for acceptance. The release was not executed by John F. Shea until October 4, 1962. It was only thereafter on October 31, 1962, that J. F. Shea Co., Inc., agent for the joint venturers, received the payment of $335,914.19 in settlement of the disputed claims against the Bureau of Reclamation.

The parties are in agreement that the claims were not settled prior to August 24, 1962, and respondent does not even contend otherwise. We therefore conclude and hold that the contested claims against the Bureau of Reclamation were unsettled and the Shea Co., regardless of those events occurring subsequent to its dissolution, could not properly accrue any amount of income in regard to such claims for its final short period which ended August 23, 1962. As of that date and at all

times subsequent thereto the Shea Co. was not moribund, it was dead, and its shareholders, to whom *all* of its assets has been transferred in accordance with a long outstanding plan of liquidation, are not liable as its transferees for income subsequently accrued. *James Poro, supra* at 644–646.

Respondent contends on brief that the "payments must be taxed to The Shea Company as ordinary income to reflect its income clearly." However, neither in his deficiency determinations nor in his pleadings did respondent even mention section 446, or that acting thereunder he had selected a method of accounting that does clearly reflect income. Respondent here did not determine that the method of accounting used by the Shea Co. did not clearly reflect income and he did not even cite section 446 or the applicable regulations in his briefs. As a matter of fact his briefs and trial arguments make it quite obvious that he has no objection to the accounting method employed by the Shea Co. or the manner in which it reflected income for the final period. Respondent's counsel made the statement during trial that "probably under normal methods of accounting the corporation did not realize this income and would not have been chargeable with this income * * *. The question is allocation of income, not realization."

Respondent contends that although the income from these claims was not realized by the Shea Co. for the period ending August 23, 1962, it must nevertheless be allocated to the Shea Co.'s final period in order to clearly reflect income in accordance with the legal principles established in *Jud Plumbing & Heating, Inc.*, 5 T.C. 127 (1945), affd. 153 F. 2d 681 (C.A. 5, 1946), and *Susan J. Carter*, 9 T.C. 364 (1947), affd. 170 F. 2d 911 (C.A. 2, 1948). Respondent contends that the above-cited cases represent a vital distinction between the concept of accrual of income, which is an accounting concept, and the concept of allocation of income, which is a legal concept of income tax law.

Respondent's reliance on the *Jud Plumbing* and *Susan J. Carter* cases is misplaced. We find those cases inapposite and clearly distinguishable from the instant one.

Analysis bears out that respondent's supposed independent principle of allocation depends, for its viability, upon the existence of accruable or realized income. In both of those cases he determined that the income in question should be taxed in accordance with the method he selected rather than with the method employed by the taxpayer to clearly reflect income. Here he has made no similar determination.

*Jud Plumbing* involved a corporation in the construction business which had been computing its income under the completed-contract method of accounting for a number of years. Upon the liquidation of this corporation, four contracts in various stages of completion, rang-

ing from 44 percent to 98 percent, were distributed to the corporation's principal stockholder, who completed the contracts during the taxable year and reported all of the profits therefrom in his own return. Respondent allocated the income derived from the four construction contracts back to the corporation based upon the percentage of total contract completion by the corporation prior to its liquidation. We upheld his determination that the method of accounting adopted by the corporation did not clearly reflect its income for the final period of its existence. In our discussion of the completed-contract method as applied to the final period of existence of the corporation, we said:

*Thus, although the completed contract method of accounting is an accrual system, its effect here, if petitioners' contention were sustained, would be to subvert the fundamental concept of an accrual system of accounting.* [Emphasis supplied.] *Jud Plumbing & Heating, Inc., supra* at 134.

It first should be noted that the Shea Co. did not report its income by the completed-contract method, a hybrid method of accrual accounting, but, instead, reported on the accrual method which the Court in *Jud Plumbing*, in effect, required the corporation to utilize in order to clearly reflect its income for the final period. As previously mentioned, respondent did not determine and is not contending that the accrual method of accounting used by the Shea Co. failed to clearly reflect income for its final period. He did not determine another method to be used and, he, therefore, cannot assert that section 446(b) authorized the use of any other accounting method. The use by the Shea Co. of what may be termed the "pure" accrual method in its final period, as contrasted with the hybrid, completed-contract method employed by the corporation in *Jud Plumbing*, does not present the slightest possibility of a subversion of the fundamental concepts of an accrual system of accounting, or the accrual method of computing taxable income.

The more important distinction between *Jud Plumbing* and the case at hand lies in the fact that as of the final date of dissolution of Jud Plumbing corporation there existed earned or accruable income in the form of partially completed contracts as to which there was no dispute; the income therefrom, based upon the percentages of completion, was reasonably ascertainable. Claims based thereon were not contested claims of unknown and undeterminable worth as are the claims involved here.

In affirming *Jud Plumbing*, the Court of Appeals reasoned that it was necessary "to allocate the income so as to reflect that which belonged to the Corporation." 153 F. 2d at 685. A further statement was made that " 'allocation of income' is chiefly a matter of the application of income tax law to basic legal rights." *Id.* Whether the words used

are "belonged to," "earned," or "accrued," they all refer to a taxpayer's fixed and determinable rights in a certain amount of income. By virtue of the contested nature of the claims before us, in contrast, it cannot be said that the Shea Co. had any income therefrom which "belonged to" or was accruable to it before it liquidated. The contested claims did not give rise to any accruable income as of the date of dissolution and no income from them can properly be allocated to the Shea Co. for its final taxable period.

*Susan J. Carter, supra,* is also distinguishable from the case at hand, as to the one issue deciding therein for which respondent cites it. In deciding that particular issue, we held that $8,648.04 of income, to which the corporation had perfected its rights before dissolution, was allocable to the final accounting period of the corporation. The corporation had attained fixed and determinable rights to certain amounts before its dissolution; respondent determined his allocation, basing his action on section 41 of the 1939 Code, the predecessor of section 446. It is only in such a situation that respondent can properly assert that this income can be allocated to the final period. We are not presented with that situation in the case before us. Otherwise, *Susan J. Carter, supra,* supports petitioners' case here.

Petitioners rely on several other cases which also support their argument that contested claims distributed in a corporate dissolution do not give rise to taxable income for the corporation's final period. *James Poro, supra; Henry Hess Co., supra; Telephone Directory Advertising Co.* v. *United States,* 142 F. Supp. 884 (Ct. Cl. 1956). We find these cases persuasive and controlling here in light of the record before us.

Respondent does not contend that any anticipatory assignment of income was made by the Shea Co. upon its dissolution. Such a contention would have little merit in light of the absence of any earned income or income over which the Shea Co. had any "control" at the time of assignment of the contested claims. See *United Mercantile Agencies, supra; Williamson* v. *United States,* 292 F. 2d 524 (Ct. Cl. 1961) ; *Telephone Directory Advertising Co.* v. *United States, supra.*

Respondent does contend however that the evidence as to John F. Shea's activity subsequent to May 16, 1962, shows that he in fact was acting as agent for the joint venture and not as president of J. F. Shea Co., Inc., agent for the individual venturers. Respondent points to section 1.708–1(b)(iii), Income Tax. Regs., which provides, in pertinent part, as follows:

For purposes of subchapter K, chapter 1 of the Code, a partnership taxable year closes with respect to all partners on the date which the partnership terminates. * * * The date of termination is:

(a) For purposes of section 708(b)(1)(A), the date on which the winding up of the partnership affairs is completed.

Respondent reasons that John F. Shea's activity was part of the actual winding up of the joint venture and that, because a joint venture cannot terminate under section 708(b)(1)(A) until it is wound up, the joint venture must have continued until December 18, 1962, when John F. Shea made the final distributions of the proceeds of the claims in question and other converted assets.

While the settlement of claims and conversion of assets by John F. Shea constitute the type of activities that could readily be a part of the winding up process of a joint venture, they could just as readily be the acts of an agent in behalf of the venturers after they have received the assets in a distribution from the joint venture. If such an agent was, in fact, converting the assets of the venturers, the income derived therefrom would be solely attributable to the joint venturers themselves; this would be true regardless of the status of the joint venture as a continuing or terminated tax entity. There is little difficulty in concluding that a joint venture would not be held accountable for income subsequently derived from assets which it no longer owns. An allocation or assignment of income argument would be defeated by the same lack of accruable or earned income at the time of distribution as we have already discussed with respect to the Shea Co.[3]

In the pleadings, respondent admitted the following allegations of the petitions:

*All of the assets of the Shea-Kaiser-Morrison joint venture were transferred to J. F. Shea Co., Inc. as the agent for the individual venturers on March 15, 1962, and the joint venture was completely terminated on May 16, 1962.* [Emphasis supplied.]

The allegation as to the joint venture's termination on May 16, 1962, is a conclusion of law, as embodied in section 708, which, although admitted by respondent, is not binding upon this Court. *Elaine Yagoda*, 39 T.C. 170, 183 (1962), affd. 331 F. 2d 485 (C.A. 2, 1964). The allegation that "All of the assets of the Shea-Kaiser-Morrison Joint Venture were transferred to J. F. Shea Co., Inc., as the agent for the individual venturers on March 15, 1962" is one of fact, not dependent upon the interpetation or application of any provision of the income tax law. Such admissions of fact are binding upon this Court and the parties to the action. *James Poro*, 39 T.C. 641, 644 (1963), acq. 1963-2 C.B. 5. The evidence of record fully supports these facts as admitted by the pleadings.

---

[3] Respondent has not asserted, and we do not consider, the possible application of sec. 751(b) which, upon the distribution of certain assets by a joint venture, treats the distribution as a sale or exchange between the joint venture and the distributee-joint venturer.

The claims against the Bureau of Reclamation and Industrial Indemnity Co. were, as logic would dictate, included among "all" of the assets distributed. J. F. Shea, Co., Inc., as agent for the venturers, proceeded to settle those disputed claims and collected them for its principals, making distribution according to their respective interests. In that the joint venture no longer owned the claims, the income subsequently derived therefrom cannot be regarded as partnership income but instead was that of the joint venturers to whom respective interests therein had been assigned.

Having concluded that the income from the settlement of the claims would not be taxable income through the conduit of a then-existing joint venture, it becomes unnecessary to determine when in fact the joint venture did terminate, but the evidence is nonetheless persuasive that it did terminate, cease doing business, and wind up as of May 16, 1962. Thereafter no part of any business, financial operation, or venture of the partnership continued to be carried on by any of the venturers; J. F. Shea Co., Inc., acted only thereafter on behalf of the venturers to liquidate and distribute their respective shares or interests in the net assets of the former joint venture.

Our final determination involves the proper characterization of this income in the hands of the shareholders of the dissolved Shea Co., to whom it was distributed by J. F. Shea Co., Inc., in December of 1962. Respondent contends, on a somewhat general level, that the fortuitous circumstance of the Shea Co.'s having liquidated prior to the realization of any income on the claims should not result in permitting petitioners to convert ordinary income into capital gain. He points out that the settlement of the claims by the Shea Co., if it had remained in existence, would have resulted in ordinary income. Why then, he asks, should not the income in the hands of the shareholders maintain that same character?

Were it not for sections 331 and 341 and a number of cases interpreting them, respondent's contentions would present a certain element of simplistic appeal. Initially, it should be pointed out that our decisions in determining the tax consequences of an event are governed by what has actually happened, fortuitous or not, rather than by what might have happened. *John M. Rogers*, 44 T.C. 126, 136 (1965), affd. 377 F. 2d 534 (C.A. 9, 1967). What has actually happened here is that a corporation has made a liquidating distribution of its share of certain contested claims, among other assets, to its shareholders in exchange for their stock. These claims were subsequently settled by

an agent in behalf of these shareholders and other principals. The tax consequences, in the application of the relevant income tax law, must flow from the events described above and not from what might have happened.

Section 331(a)(1) provides that "amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock." If the stock is a capital asset in the hands of the shareholder, as it is in the case before us,[4] a complete liquidation will result in capital gain or loss since section 331(a) treats the liquidation transaction as an exchange of stock. The fact that contested claims are part of the full payment in exchange for the stock does not change this result. When contested claims, or any other asset similarly incapable of valuation, are received in a corporate liquidation, the computation of capital gain with respect to these claims is held "open" until they are settled, collected, or otherwise reduced to property of ascertainable value. *Susan J. Carter, supra; Westover v. Smith*, 173 F. 2d 90 (C.A. 9, 1949). The settlement of the claims against the Bureau of Reclamation and Industrial Indemnity Co. produced those ascertainable values needed to "close" the transaction and enable petitioners to compute the capital gain from the exchange of their stock.

Respondent also contends that the claims should be valued as of the time of liquidation at an unspecified amount, less than the amount actually collected subsequently from the Bureau of Reclamation and Industrial Indemnity Co. He argues that if we determine *some* ascertainable value, the difference between that value and the amounts ultimately collected would constitute ordinary income to the shareholders. He however neglects to offer even so much as a hint as to how an ascertainable fair market value may be determined. On the record before us, as reflected in our findings, we must conclude that the claims had no known or ascertainable fair market value when the Shea Co. ceased to exist. It is because of the impossibility of ascertaining the fair market value of contested claims such as are here involved, that transactions of this type are held open and the value ultimately determined when settlement and collection occurs. *Westover v. Smith, supra; Susan J. Carter, supra*. A determination of fair market value here in accordance with respondent's contention would

---

[4] Sec. 1221 treats stock as a capital asset unless it is held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. The stock involved here was not held primarily for sale in the ordinary course of any of the petitioners' businesses and, accordingly, is treated as a capital asset.

not be an ascertainment; it would be fictitious, speculative, and a wild guess which we are not willing to make.

A notable exception to the capital gains treatment afforded stockholders of a liquidating corporation is found in the collapsible corporation provision of section 341.[5] It can be stated, only as a very broad generalization, that section 341 treats the gain from the exchange of stock as ordinary income when at the time of such exchange a substantial part of the total potential income has not yet been taxed at the corporate level. This is the one basic section which deals with the transformation of ordinary income into capital gain that respondent complains of here and, it is, as respondent admits, inapplicable to the instant case.

In conclusion, we hold that the income from the settlement of the claims in question was neither taxable to the Shea Co., to the individual petitioners as transferees of its assets, nor to the joint venture in which it had formerly been a member and through it to the individual shareholders to whom all assets of the Shea Co. had been previously distributed. *James Poro, supra.* The shareholders of the dissolved Shea Co. received the claims as part of the consideration in exchange for their stock and properly reported the subsequent recoveries thereon as their income taxable at capital gains rates.

*Decisions will be entered for the petitioners.*

---

[5] SEC. 341. COLLAPSIBLE CORPORATIONS.

(a) TREATMENT OF GAIN TO SHAREHOLDERS.—Gain from—

(1) the sale or exchange of stock of a collapsible corporation.

(2) a distribution in partial or complete liquidation of a collapsible corporation, which distribution is treated under this part as in part or full payment in exchange for stock, and

(3) a distribution made by a collapsible corporation which, under section 301 (c) (3) (A), is treated, to the extent it exceeds the basis of the stock, in the same manner as a gain from the sale or exchange of property,

to the extent that it would be considered (but for the provisions of this section) as gain from the sale or exchange of a capital asset held for more than 6 months shall, except as otherwise provided in this section, be considered as gain from the sale or exchange of property which is not a capital asset.

(b) DEFINITIONS.—

(1) COLLAPSIBLE CORPORATION.—For purposes of this section, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in paragraph (3), or for the holding of stock in a corporation so formed or availed of, with a view to—

(A) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, before the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the taxable income to be derived from such property, and

(B) the realization by such shareholders of gain attributable to such property.